Judgment reversed.

---

## HONESDALE GLASS CO. v. G. W. STORMS.

### ERROR TO THE COURT OF COMMON PLEAS OF WAYNE COUNTY.

Argued February 28, 1889—Decided April 8, 1889.

[To be reported.]

1. Where the execution of an instrument has been obtained by means of a fraud, or where there is an attempt to make a fraudulent use of it, in violation of an agreement made at the time of its execution and without which it would not have been executed, parol evidence is admissible to prove the agreement, though contradicting the terms of the instrument.

2. Evidence to be admissible, in this class of cases, must be clear, precise and indubitable;—not in the sense that there must be no opposing testimony, but in the sense that the evidence must carry a clear conviction of its truth and be sufficient in weight to move the conscience of a chancellor to reform the instrument.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and MITCHELL, JJ.

No. 241 January Term 1889, Sup. Ct.; court below, No. 91 December Term 1886, C. P.

To the number and term of the court below, stated above, George W. Storms brought assumpsit against W. W. Weston and others, trading as the Honesdale Glass Company. The declaration was in the common counts, and the defendants pleaded, not guilty.

At the trial on May 11, 1888, the essential facts were that the plaintiff had been employed by the defendants as an apprentice in their glass-works. By the contract, alleged by the plaintiff to have been by parol, but by the defendants to have been in writing, but lost, a certain percentage of plaintiff's compensation was to be retained until the end of his term, and if he failed in the proper performance of his duties or left before his term closed, this " back pay," as it was called, was to be forfeited. The plaintiff contended that the term was for four years, beginning on October 1, 1881 ; the defendants contended that it was for four and one half years and began March 1, 1882.

On October 1, 1885, the plaintiff, alleging that his term was ended, quit his apprenticeship. The defendants, alleging that the term continued until four and one half years had elapsed from March 1, 1882, refused payment of the money which had been retained. On October 24, 1885, the parties made a sealed agreement, hereafter quoted, under which the plaintiff resumed work for the defendants and continued therein for the period agreed upon; $43.69 was then tendered, as the amount due the plaintiff under the new agreement, which the plaintiff refused, claiming also the retained pay due under the original contract, amounting on October 1, 1885, to $531.82.

To sustain their defence to the plaintiff's claim, the defendants put in evidence the sealed agreement referred to, dated October 24, 1885, executed by the plaintiff and the " Honesdale Glass Company, per W. W. Weston," and attested by Albert J. Henderson, and which provided :

" That whereas, said George Storms was an apprentice to the parties of the second part for four and a half years from March 1, 1882, and that as he left the said company's employment, and thus breaking his agreement, and forfeiting all his claims on said company, now this new agreement, made October 24, 1885, witnesseth : That said parties of the second part agree to take said George Storms for the term of one year from

November 1, 1885, to finish his trade as glass blower, on the following conditions : To pay him the net prices that we adopt, less forty per cent off, then ten per cent to be retained as a back money, to be paid him at the expiration of the 12 months, providing he has attended faithfully to his work, and obeys the foreman or the parties of the second part; and any disobeyment of orders, refusing to work or put in moulds, at any time, or fails to work his time out, he forfeits his place, and all back money, and any and all loss of time is to be made up after his time expires. His wages, less forty per cent, and ten per cent, to be paid him according to our rules of paying apprentices, and this to be in full of all demands."

To meet the position of the defendants that the foregoing instrument when executed was an acknowledgment by the plaintiff of his failure to serve out his apprenticeship and the forfeiture of his arrears of pay, the plaintiff adduced testimony, sufficiently appearing in the opinion of this court, to the effect that he executed the instrument entirely upon the faith of a promise made by the defendants at the time when it was executed, that if he signed it he would be paid all his arrears of pay under the original contract. The plaintiff testified, also, that a portion of the instrument had been interpolated after its execution.

At the close of the testimony, the court, SEELY, P. J., charged the jury as follows :

Much of the evidence in this case relates to the agreement of October 24, 1885. It is alleged, upon the one hand, that the defendants were very anxious to induce the plaintiff to come back in their employ. And on the other hand it is alleged that the plaintiff was very anxious to have the defendants take him back into their employ. And each side seeks to substantiate its position by evidence.

This, however, is not material, except as it may assist you in determining other material facts in the case, bearing upon the execution of this agreement. The plaintiff testifies that he went to see Mr. Weston, and found him at the office of the glass company, that Mr. Weston had this paper, and that he asked him if he would let him take it over to his house, to have it examined there, and that Mr. Weston then proposed to go

over himself to the house with him, and take the paper along, and that he did so, and you have the testimony of the different members of the family as to what took place there. None of them testify that Mr. Weston read this contract there. There was, perhaps, some reading, and some talk, but it is impossible, under the evidence, to ascertain how much, if any, of the instrument was read, if it was there. Mr. Weston denies that he took this instrument there, at all, but he says that this instrument was drawn in his store, and taken down to the office of the glass company, and signed within an hour after it was drawn. When, and where was this instrument signed? Mr. Stevens and Mr. Weston both testify that it was signed at the office of the glass company, below the borough of Honesdale, and that at that time Mr. Weston read it to Mr. Storms, and that Mr. Henderson was there and signed it as a witness. Mr. Storms and Mr. Henderson both assert that it was signed at Mr. Weston's store, in the evening, at about 8 o'clock, and that Mr. Storms and Mr. Henderson came in there and asked to have the paper; that Mr. Weston handed it to them, and that Mr. Henderson looked it over, and said that he didn't see anything out of the way in it, and that it was signed then and there. Whichever of these versions is true, they both of them show that the plaintiff must be presumed to have known the contents of this agreement at the time it was signed. . . . . .

The defendant's counsel have submitted certain points in writing, asking us to instruct you as follows [inter alia]:

1. That the plaintiff having admitted that he was an apprentice, and subject to the rules and forfeitures regulating apprentices, he forfeited the back money in controversy, if he voluntarily quit work before the expiration of his time.

Answer: Affirmed.

3. That the plaintiff having proved by Henderson that the paper signed October 24, 1885, contained when he signed it the statement " That whereas said George Storms was an apprentice to the party of the second part for four years and a half from March 1, 1882," he has fixed and agreed to that as the date, and he cannot now contradict it by parol, even though there might have been a blank left below that, which was afterwards filled, said alleged filling not referring to said date; and therefore the jury must accept the date set forth in said writing

as correct, and that the term, even as claimed by the plaintiff, not having expired at the time he left, the plaintiff is not entitled to the back money, and their verdict upon that must be for the defendants.

Answer: This requires us to say to you that your verdict must be for the defendants; of course, it means as to that part of the back money relating to the first contract of apprenticeship, and not as to the $43. We decline to say so to you, because we think there are other matters in this case which it is necessary to submit to you, and we refuse this point.[1]

4. That the plaintiff having called in a friend to examine the contract before he would sign it, and having signed it under the advice and recommendation of that friend, he cannot excuse himself by saying he did not understand it, nor can he set up conversations had, if any, at any time previous to the signing.

Answer: The difficulty about this point is the indefinite proposition, " he cannot set up conversations had, if any, at any time previous to the signing." Set up for what? They might be set up for some purposes, and not for others. We answer this point by saying that, without reference to any former conversation, he must be taken to have signed the contract with full knowledge of its contents, as then written.

5. That the jury must not allow alleged conversations at Storms's house, before the time of the execution of the paper, to have any influence upon their minds, in considering the contract. Parties have a right to change their minds at any time previous to the execution, and there is no allegation that anything was said by Weston as to the contents or effect, after Henderson and Storms had examined it and pronounced it all right.

Answer: This is true, so far as the contents of the written contract are concerned. We have already said to you, more than once, that the plaintiff, when he signed that contract, must be presumed to have known what he was signing, and what the language of the contract was, and in that respect it cannot be affected by any conversation which had taken place previous. To the latter part of this proposition, "there is no allegation that anything was said by Weston as to the contents or effect, after Henderson and Storms had examined it and

pronounced it all right," is a matter that you must determine. If the contract was signed at Mr. Weston's store, as Henderson and Storms say it was,—Mr. Henderson testifies that at some time in the conversation while they were there, whether it was before or after he had examined the contract, we do not now recollect, that Mr. Weston said if he signed the contract he would get all his back money for four years. You will remember what that testimony was, and how it affects this matter.[2]

6. That the contract is an instrument of a high order, and is not to be set aside upon suspicion, nor upon any but the strongest and clearest testimony.

Answer: Affirmed.

7. That under all the evidence the plaintiff is not entitled to recover anything except the $43.61.

Answer: That we decline, because we desire to submit some questions to you.[3]

If the plaintiff forfeited his back pay in October, 1885, by refusing to work, before his term had expired, then it is not a matter that concerns us whether it is a hardship upon him or not, to hold him to the terms of his contract. We sit here, not to say whether men's contracts are easy for them, nor whether they should be relieved from the responsibilities that they have assumed under their contracts; but we sit here to determine what they have agreed to do, and what they are entitled to under their agreement. If that back pay was forfeited, that was the end of the obligation on the part of the company, at that time, to pay him one dollar of that back money. And if any such obligation existed afterwards, it was by reason of some subsequent agreement. If it was not forfeited at that time, then he would have a right to recover it, unless by some subsequent agreement or arrangement he had cut himself off from the right to recover it. This agreement, entered into October 24, 1885, does cut him off, and acknowledges that he had forfeited his back money, and that he had no claim upon the company, and that the pay for this additional year was to be in full of all demands.

There is one additional point to be considered. It would be competent, if the plaintiff had forfeited his back money, for the defendants to make a new arrangement, by which they should agree to pay him that back money. He comes here, by him-

Charge of Court below.

self, his mother, and other members of the family, and testifies that Mr. Weston said that if he would sign this contract he would get all his back pay for the four years. Mr. Weston says that he did not say any such thing, and they do not allege that he said it was in the contract, but they allege that Mr. Weston promised that if the plaintiff signed this contract he should receive all his back pay. Such a contract, if made for a valuable consideration, would be binding upon the defendants, even though he might have forfeited his back money by his conduct previous to that. And one of the questions we purpose to submit to you is, if his back money was so forfeited, did the company, for a valid consideration, subsequently agree to pay that back money to him, in case he would sign this new contract, and stay with them another year? He says they did. All the conversations upon that point occurred prior to the execution of this written agreement. Mr. Weston denies having made any such offer. This written agreement which is entered into, expressly sets forth that the back money was forfeited, and that the money to be paid for the year's work under that contract was to be in full of all demands against the company. This written contract is inconsistent, upon its face, with that theory. And yet we cannot say that it forbids the establishing, by evidence, that the company did agree that in case this contract should be signed they would pay him that back money. We only say that in considering the evidence upon that point, you should take into consideration just what this written paper sets forth, which he signed subsequently to these conversations.

There is much in this case to which we cannot call your attention. . . . .

Mr. Purdy: There is one proposition which I have embodied in a point, which is that if the jury believe from the evidence that W. W. Weston said to the plaintiff, when he signed the contract, as testified to by the plaintiff, and corroborated by Henderson, that if he would sign it he would get all his back money, and such representations, if made, induced him to sign it, he is entitled to recover, notwithstanding the contrary statement contained in the contract.

By the Court: That is correct, and we have already stated that, in substance. We have said to you that the written

agreement might be affected by proof of a verbal agreement made at the time the written agreement was executed, by which one of the parties was induced to sign the written agreement. The rule is this, that a written agreement may be affected or qualified by proof of a contemporaneous verbal agreement which was the inducement to one of the parties to sign it. But such contemporaneous verbal agreement must be proven by evidence which is clear, precise, and indubitable. It requires a higher degree of evidence, and a greater weight of evidence, to cast aside a written agreement, than it would a simple verbal agreement. But, if you find that the evidence is clear, precise, and indubitable, showing that at the time this instrument was executed, Mr. Weston then stated to the plaintiff that if he would sign this agreement he should have his back pay for the whole four years, and if you find that he was induced by this statement to sign this written agreement, then it would be only right that the parties should be held to that statement, and you might find that the plaintiff was entitled to recover.

The jury returned a verdict in favor of the plaintiff for $628.24. A rule for a new trial having been discharged, judgment was entered on the verdict, whereupon the defendants took this writ, specifying that the court erred:

1–3. In the answers to defendants' points.[1 to 3]

4. In submitting to the jury, under the evidence, the question of the existence of a parol contract contradicting or varying the effect of the sealed agreement of October 24, 1885.

*Mr. H. Wilson* (with him *Mr. A. T. Searle*), for the plaintiffs in error:

1. Parol evidence is admissible to establish a contemporaneous oral agreement which induced the execution of a written contract, though it may vary, change or reform the instrument. The real question is, whether there was a parol stipulation, inducing the signing of the instrument, which ought to be made a part thereof, to effectuate the intent of the parties. If so, the instrument may be reformed, upon evidence to that end which would be sufficient in a court of equity: Thomas v. Loose, 114 Pa. 45. The judge ought not to submit the case to the

jury, however, unless the evidence is such that he would feel himself bound as a chancellor to reform the instrument: Phillips v. Meily, 106 Pa. 543.

2. The alleged parol promise and agreement, in this case cannot stand as an independent contract, as it was wholly without consideration. The written contract contained within itself the consideration moving the parties to the performance of its covenants, and the covenants respectively were accounted equal in value, each serving as the consideration of the other. Under the principles frequently laid down, and affirmed in Sylvius v. Kosek, 117 Pa. 76, the evidence in the present case (reviewed) was insufficient to require a reformation of the contract, and the case should not have been submitted to the jury.

*Mr. George S. Purdy,* for the defendant in error:

1. It is the undisputed law in Pennsylvania, that " a written agreement may be modified, explained, reformed or altogether set aside by parol evidence of an oral promise or undertaking, material to the subject matter of the contract, made by one of the parties at the time of the execution of the writing, and which induced the other party to put his name to it: " Walker v. France, 112 Pa. 203; Cullmans v. Lindsay, 114 Pa. 167; Greenawalt v. Kohne, 85 Pa. 369; Hoopes v. Beale, 90 Pa. 82; Whitney v. Shippen, 89 Pa. 22; North & W. Br. Ry. Co. v. Swank, 105 Pa. 555; Ott v. Oyer, 106 Pa. 6; Chalfant v. Williams, 35 Pa. 212; Powelton Coal Co. v. McShain, 75 Pa. 238; Graver v. Scott, 80 Pa. 88; Shughart v. Moore, 78 Pa. 469; Kostenbader v. Peters, 80 Pa. 438.

2. A conflict of evidence is no bar to the rule: Logue's App., 104 Pa. 140; McGrann v. Railroad Co., 111 Pa. 171; Hartley's App., 103 Pa. 23; McGinity v. McGinity, 63 Pa. 38; Horn v. Brooks, 61 Pa. 407. The law does not require proof so convincing as to leave no doubt resting on the minds of the jurors; it is enough if there be evidence to satisfy an unprejudiced mind beyond reasonable doubt: Ott v. Oyer, 106 Pa. 6; Keogh v. Leslie, 92 Pa. 424; McGrann v. Railroad Co., 111 Pa. 183. The testimony of the plaintiff, corroborated by that of Henderson, was sufficient to take the case to the jury, without the testimony of the plaintiff's father, mother and sister, and the corroborating circumstances: North & W. Br. Ry. Co. v.

Swank, 105 Pa. 555. Moreover, on questions of fraud, every circumstance or fact from which a legal inference of fraud may be drawn, is evidence : Yerkes v. Wilson, 81* Pa. 9; B. & O. R. Co. v. Hoge, 34 Pa. 214; the competency of the evidence is for the court, its credibility for the jury: Shaffer v. Clark, 90 Pa. 98; Prowattain v. Tindall, 80 Pa. 295.

OPINION, MR. JUSTICE GREEN :

The learned court below distinctly charged the jury that if the plaintiff had forfeited his back pay, that was the end of the defendants' obligation, and that obligation could not be restored except by force of some subsequent agreement. The court also charged that if the back pay was not forfeited the plaintiff would have a right to recover it, unless he was cut off from doing so by some subsequent agreement. The defendants alleged, in the first place, that the back pay was forfeited by the plaintiff in consequence of his not serving out his time as apprentice, and that was one of the questions of fact for the jury to determine. It was entirely undisputed that the plaintiff had served the defendants for several years as apprentice and had a credit on their books for which he was entitled to a verdict unless it was forfeited by his breach of his contract of apprenticeship, or voluntarily given up by a subsequent agreement. The original contract or indenture was not given in evidence, as it was either lost or destroyed, and there was conflicting evidence as to when the service commenced and when it ended. All of this was necessarily for the jury and they have decided it in the plaintiff's favor.

The principal contention was upon the effect of a subsequent agreement for the plaintiff's re-employment. This was in writing and it contained a recital that the plaintiff was an apprentice to the defendants for four and one half years from March 1, 1882, and that he had left the defendants' employment and thus forfeited all claims on the defendants, and then proceeded to express a new contract for the plaintiff's re-employment for one year from November 1, 1885, upon certain terms mentioned. This contract the plaintiff performed out to the end of the time, but when the defendants tendered him a small balance of $43.61, claiming that was all they owed him, he declined to receive it claiming that they owed him the full

amount of his back pay, to wit, $531.82. This the company re-fused to pay and relied upon the second contract as excluding him from the right to recover it. If that contract prevails, the con-tention of the defendants is sustained and the plaintiff could re-cover no part of the back pay. It is true, the facts which would defeat his right to recover the back pay, are a mere matter of recital in this contract, but as they would be material to, and would, in fact, be a part of the consideration of the new con-tract, they are an essential portion of it.

In reply to this contract, the plaintiff says he was induced to sign it by means of a positive promise, made to him at and immediately before the execution of the agreement, that if he would sign it he should be paid the whole amount of his back pay. This is denied by Weston, who prepared the contract and obtained the plaintiff's signature to it, but it is testified to by the plaintiff, by his father, mother and sister, and also by Henderson, who was the subscribing witness and a disinter-ested person. The witness Stevens testified that he was pres-ent when the paper was signed, but he did not attest it and knew nothing about Henderson's presence, and he says noth-ing one way or the other as to what was alleged by the plaint-iff and his witnesses, in regard to the promise made by Weston concerning the back pay. On the one side, therefore, is the paper itself and the testimony of Weston ; and on the other, is the testimony of the plaintiff and Henderson, as to what was said at the moment of execution, and the corroborating testimony of the plaintiff's father, mother and sister, as to Weston's prom-ise made either at the time of, or very shortly before, the execution. If the promise was made, and by that means the plaintiff's signature was obtained, it was, of course, a fraud to set up the contract afterwards against his claim for back pay. In that aspect of the case it comes within the very numerous decisions of this court which hold substantially that when the execution of an instrument has been obtained by means of a fraud, or where there has been an attempt to make a fraudulent use of the instrument, in violation of a promise or agreement made at the time the instrument was signed and without which it would not have been executed, parol evidence may be given to prove the fraud, though it contradict the instrument. Some of these cases are the following : Greenawalt v. Kohne, 85 Pa.

369; Hoopes v. Beale, 90 Pa. 82; Hartley's App., 103 Pa. 23;
Phillips v. Meily, 106 Pa. 537; Walker v. France, 112 Pa.
203; Cullmans v. Lindsay, 114 Pa. 167; Ott v. Oyer, 106 Pa.
6; Thomas v. Loose, 114 Pa. 35. Of course, in all this class
of cases, the evidence must be clear, precise and indubitable;—
not indubitable in the sense that there must be no opposing
testimony, but in the sense that it must carry a clear convic-
tion of its truth, as we said in Hartley's App., 103 Pa. 23.
The evidence must also be sufficient to move the conscience
of a chancellor to reform the instrument, as we have said many
times. In the present case the evidence was given to the jury
with instructions in accordance with the above cited decisions,
and the jury has found for the plaintiff, thus establishing the
fraud.

It only remains to consider whether there was evidence
sufficient to warrant its submission to the jury. George W.
Storms, the plaintiff, testified, after relating at considerable
length the efforts of Weston to get him to sign the paper and
his own hesitancy to do so, as follows: " Q. What did Mr.
Weston say to you in the store at the time you signed this
paper? A. I walked in and bid him the time of evening and
told him I had come up and would like to see that paper and
he said, ' Here is the paper, sign it,' and he said, ' If you do
not sign that paper now, you will forfeit all your back money,
and if you do sign that paper you will get all your money just
as soon as you serve this one year, all of your four years back
money.' And I asked him if he had a copy and he said he had
not, but Mr. Stevens would give me a copy any time I wanted
it. And he told me to take the paper and read it, and I could
not read the paper, but I went down to the store and Mr.
Henderson was sitting there, and he looked at it and he told
me that the paper was all right as far as he understood it."
He had previously testified to the controversy about the back
pay, and that on one occasion when Weston wanted him to
sign the paper, he had expressed his unwillingness to sign a
paper he did not understand, and asked for a copy; that then
Weston, in reply to a suggestion that they should take it over
to the house where his father and mother and sister were, pro-
posed that he would go along, and they accordingly went over
together and then talked about the paper. Henderson testi-

fied that he went to the store with Storms and the paper was
shown to him and he read it. He was asked: " Q. What was
said with reference to Mr. Storms coming back? What did
Mr. Weston say? A. Well Mr. Storms spoke to him about
signing the paper and he gave it to him to look at it, and Mr.
Storms said he would like to have a copy, and Mr. Weston
said he had something to do besides bothering with glass-
blowers. He could sign that paper and go to work and get
his money back, and if he did not sign it he would never get
another day's work in the factory and would never get a cent
of his back money." " Q. You stated that Mr. Weston said
that if he signed this paper he would get all his back money?
A. Yes, sir." There was much other testimony by this witness
giving the details of the transaction but it is not necessary to
repeat it as the portion quoted is the most material part of it.
As to what took place at the house, Jacob Storms, the plaint-
iff's father, testified: " When my boy's time was up he quit.
After the boy quit Mr. Weston came down to the house and
then he had the paper on his own side. And he came down
to our house and stood right in front of the table and he said:
' I want your boy to sign that paper for one year and a few
months more, and I will give him one of the best places in the
factory.' And my wife said: ' Has that anything to do with
his four years back money, if he signs that paper?' And Mr.
Weston said, ' No not at all, but if he does not sign it, see
what your boy will lose. And not only your boy, but see
what we will lose.' And my wife and two daughters were
there at the time. Q. What did he say about his back money?
A. He said if he did not sign that paper he would lose all his
back money, but if he signed it everything will be all right."
The plaintiff's mother testified that Weston came to the house
with a paper for George to sign, and, being asked what was
said, replied: " He said that George must sign that paper and
go back to work or lose his back money, and he said to me,
' Talk to the boy and ask him to go back and coax him to go
back.' He said to me, ' Tell your boy to sign that paper and
go back to work, or else he will lose his back money.' Q. Did
he say anything about his getting the best place in the shop?
A. I asked Mr. Weston if George signed the paper, and went
back to work for another year, if that had anything to do with

losing the four years back money, and Mr. Weston said, no, that at the end of the year he should get his back money in full." Elizabeth Storms, the plaintiff's sister, having stated that Weston came to the house, was asked: " Q. What did Mr. Weston say in the house? A. He brought the paper there and told George to sign that paper, and George said he would not, and Mr. Weston said if he signed that paper he would get all his back money and the best place in the factory, and if he did not sign that paper he would lose all his back money." From the sister's testimony it would seem that George was in the room when the conversation took place. The father and mother do not say whether or not he was then present. George said he went out a few minutes while Weston was talking to his parents, but it is a fair inference from all the testimony that this conversation took place on the same evening the paper was signed, or very shortly before. But, however that may be, the testimony of all these witnesses is clear, precise, positive, very definite, and, if the witnesses are believed, indubitable in its character. We know of no reason to disbelieve the witnesses except that they differ from Weston, but the jury were the judges of their credibility and they believed them.

Moreover, the probabilities of the case are strongly in the plaintiff's favor. The whole dispute was in reference to the back pay. Admittedly, the plaintiff had served the defendants, as an apprentice, his whole time except a year and some months, even according to Weston's testimony. They finally agreed that he should serve one year more, leaving out the odd months, and the defendants would then regard the service as complete for the whole term. This being so, why should the plaintiff not have his full pay? The defendants had received the full consideration for the full pay, why should they not make the payment? Because, say the defendants, the new agreement did not provide for it, and contains recitals that the plaintiff had forfeited his claims on the company. While this would be a good answer, if it was quite clear that such was the real contract of the parties, the very dispute between them is whether the execution of such an agreement, certainly very hard in its terms, was not procured by means of a promise that the back money should be paid. The proof is exceedingly strong that such was the fact. It was, according to the witnesses, accom-

panied by a threat that if he did not sign he would lose all his back pay, so that it was the very point in controversy; and it is very difficult to believe that if this was the subject of dispute up to the moment of execution, the plaintiff would all at once abandon his whole claim and agree to give another whole year's service for nothing but the small pay of an apprentice, and thus complete the term of his apprenticeship without receiving any part of the large amount he had already earned. Such a conclusion would be contrary to reason, would be highly injurious to the plaintiff, and is certainly opposed to the greatly preponderating weight of the testimony.

The company was evidently contracting for the completion of the term of service, according to their view as to what that term was. The plaintiff, claiming he had already completed the service, was reluctant to make any new contract inconsistent with his view of that subject. This being so, the parties made mutual concessions, the company abandoning the four odd months, over the year, and the plaintiff agreeing to work one more year. The subject of the new contract, therefore, apparently was, the determination of the term of service. This being the case, it is almost if not quite impossible to understand why the plaintiff should agree not only to complete the time of his service as apprentice, but also to abandon his entire claim for compensation for a full term's service. It is curious to observe, in this connection, that the new contract, while it recites that the original term agreed upon was four and one half years from March 1, 1882, " thus breaking his agreement and forfeiting all his claims on said company," does not proceed to declare the forfeiture, or contain any agreement that the back pay shall be surrendered. So far as this recital is concerned, it is certainly consistent with the idea of a mere statement that a forfeiture had been incurred but would be condoned. At any rate the recital is not followed up by any expressed or necessarily implied agreement by the plaintiff to surrender his back pay. The last clause of the contract which relates to the payment of the year's wages and says it shall be in full of all demands, is too indefinite to be regarded as an explicit surrender of the back pay. It could only serve such a purpose by way of a trap, and would require very clear evidence that it was explained to and so understood by the

plaintiff, before it could with any justice receive such an interpretation. The great bulk of the evidence is in direct opposition to such a theory, and the contract itself does not speak in clear terms to the contrary. The court below was right in submitting the case to the jury, and the assignments of error are therefore not sustained.

Judgment affirmed.