## Mary H. Simon, Appellant, v. Annie E. Simon et al.

[Marked to be reported.]

*Equity—Setting aside conveyance—Deed—Evidence.*

Equity will, upon proper occasion, intervene and set aside voluntarily executed deeds and other instruments, yet the power to do so is of an exceedingly delicate character, not to be lightly exercised, and only to be invoked when the manifest justice of the case requires it.

On a bill in equity to set aside a deed executed by a mother to her daughters, the mother, who was the plaintiff in the bill, testified that she executed it in compliance with a request of one of her daughters, at a time when plaintiff's husband was financially embarrassed; that nothing was said as to how her husband's debts would affect her; that she knew that her property was not subject to her husband's debts, but that she had executed the deed in a fright. The deed was executed both by plaintiff and her husband, and at the same time the daughters executed a deed for a life estate in the property to their parents. A witness who was present when the deed was signed testified that plaintiff and her husband said that they were going "to give the girls a home." Plaintiff's son testified that when he returned home on the day the deed was signed, plaintiff said: "I gave the girls a deed to this property. I only done it for protection." The daughter who requested the mother to execute the deed testified that she told plaintiff to give the property to her daughters in her lifetime, and that plaintiff asked her husband if he was willing they should have it, and he said he was. It appeared that the grantors were elderly people, and that the two daughters who lived at home were of middle age. There was no evidence of solicitation, imposition, or any wrongful action on the part of the grantees. *Held*, that the deed should not be canceled.

Argued May 31, 1894. Appeal, No. 38, May T., 1894, by plaintiff, from decree of C. P. Dauphin Co., Equity Docket No. 151, dismissing bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill to set aside deed. Before SIMONTON, P. J.
The facts appear by the opinion of the Supreme Court.

*Error assigned* was dismissal of bill.

*Robert Snodgrass*, for appellant.—Any influence which leads or induces one to do that which is not the result of a deliberate and intelligent judgment must be considered undue influence. It need not be any specific act, or anything said or done, but may result even from silence, where the circumstances are such as to require a party to speak : Herster v. Herster, 116 Pa. 612 ; Darlington's Ap., 86 Pa. 512 ; Worrall's Ap., 110 Pa. 349 ; Yardley v. Cuthbertson, 108 Pa. 460 ; Huguenin v. Baseley, 14 Ves. Jr. 273 ; Turner v. Collins, L. R. 7 Ch. App. Cases, 329 ; Miskey's Ap., 107 Pa. 611 ; Darlington's Est., 147 Pa. 624 ; Cunningham's Ap., 122 Pa. 464 ; Butlin v. Barry, 1 Curteis, (Eng. Ec. Repts.,) 614.

The circumstances and surroundings of this transaction were such as to raise a presumption of undue influence, and to throw upon defendants the burden of showing the contrary by clear and satisfactory testimony.

There is not a particle of evidence to show that the making of this deed was " fair and conscientious." In any aspect it was eminently unfair and unrighteous. It deprived plaintiff of all the property she had in the world. It conferred an unfair advantage upon the three daughters under the circumstances.

In such a case there must not only be some one present competent to advise, but such advice must be actually given as will enable the party to act understandingly, and with a full realization of the effect and consequences of the action about to be taken : 2 L. C. Eq., p. 1206.

*Lyman D. Gilbert, John H. Weiss* and *R. E. Wright* with

him, for appellee.—Appellant perfectly understood the nature and result of her action.

No undue influence was used by appellees to induce appellant to convey to them the property in dispute.

A gift from a parent is certainly not presumed to be invalid, and can only be revoked upon proof of the exercise of actual undue influence, and not upon any presumption of invalidity : 2 Pom. Eq. § 962 ; Jenkins v. Pye, 12 Pet. 241 ; Dean v. Negley, 41 Pa. 312 ; Harrison's Ap., 100 Pa. 459 ; Howe v. Howe, 99 Mass. 88 ; Greer v. Greer, 9 Grat. 330.

Our view of the case is sustained by Darlington's Est., 147 Pa. 624 ; Crothers v. Crothers, 149 Pa. 201 ; Rockey's Est., 155 Pa. 453 ; Miller v. Oestrich, 157 Pa. 264 ; Herster v. Herster, 122 Pa. 239.

Appellant had competent means of forming an independent judgment with respect to the act which she did.

The litigation is not the free act of appellant, but is inspired by her sons.

OPINION BY MR. JUSTICE GREEN, July 12, 1894:

We think this case was correctly ruled by the learned court below.    While it is entirely true that, in circumstances which have been well defined in several of the decisions of this court, equity will, upon proper occasion, intervene and set aside voluntarily executed deeds and other instruments, yet the power to do so is of an exceedingly delicate character, not to be lightly exercised, and only to be invoked when the manifest justice of the case requires it.    An examination of the testimony shows that the leading facts and circumstances which induce judicial action in this class of cases are not present. There was no mental unsoundness or feebleness on the part of the grantor, there was no exertion of undue influence to procure the execution of the deed, there was no advantage taken of a confidential relation as was so eminently the case in Yardley v. Cuthbertson and Miskey's Appeal, there was no want of knowledge of the true and full character of the act; and there was the concurrent advice and consent of the grantor's husband to the making of the deed, and the deed was prepared at the office of an honorable and distinguished member of the bar to whom the grantors were in the habit of applying for legal ad-

vice when they desired any. The testimony is not at all conflicting. Some witnesses state more circumstances than others, as is always the case, but they are not contradicted and there is really no conflict of testimony in the case. The plaintiff's own personal testimony is practically fatal to her case, as it discloses the absence of the kind of facts, without which equity will not interfere in this kind of cases. She testified that she had signed many deeds with her husband for the purpose of conveying different properties of his to other persons, and she therefore knew the effect of such transactions.

Upon her examination on her own behalf she testified as follows: " My husband died September 29, 1889. The deed from my husband and me to my three daughters, I remember; it was made about a month before his death. He was not well and worried. He was worried about his business affairs. I don't know whether that worriment had relation to his debts. He did not express that worriment to me but I knew he was worried. Annie, my daughter, first spoke to me about making the deed. It was some time before it was made. She said that she was advised that if I would sign my property over they would be safe—the girls. She said I was to assign it to the three daughters. She said they would be safe on account of the business affairs—the money matters. Things were in an unsettled condition—I don't think she said that, but that is what she meant. There wasn't much said about making this deed to me. When I speak about things being unsettled I mean the family affairs—Mr. Simon's estate—I know there were debts pressing. There was nothing said by Annie as to how those debts would affect me. She did not say why she wanted the property conveyed to her and her sisters—only she would like to have it, as in that case they would be more safe. The property was my own. It came to me from my father's estate. I think Annie spoke to me more than once about this deed. In speaking about making the conveyance, Annie wanted me to sign it to them that they would be safe, that they would have a home. I understood her to mean that they would have nothing to live on if it was not made over to them, on account of papa's business affairs. That was it. That was the reason I did it. I knew at the time that it was not subject to my husband's debts, but I did it in a fright and I didn't know what I

was doing, I guess, or I would not have done it. Mr. Keiper came and had the deed made and brought it to me for my signature. Annie told me that Mr. Keiper had advised her to have me to make the deed to the girls. She didn't tell me anything else that Mr. Keiper had advised her to have me do. Mr. Keiper brought the deed to me. He brought an alderman with him to take my acknowledgment. I don't think anybody but the alderman and Mr. Keiper were present when the deed was acknowledged by me and my husband. The deed was read to me by Mr. Keiper. He said nothing to me at that time about making it—nothing at all."

It will be at once seen from the foregoing testimony of the plaintiff that she understood perfectly well what she was doing, she knew the effect of a deed, she knew that she was conveying the property to her three daughters, that she was not acting under the effect of any undue influence, that she was not even importuned to make the deed, but merely asked by one of her daughters upon one or two occasions to do so, and a very good reason stated at the time why it had better be done. She knew that her property was not liable for her husband's debts, and she does not say that her daughter or any one else told her that it was. The master expressly finds that the proofs fail to establish that allegation in the bill. But although a married woman's property is not liable for her husband's debts, it is not at all uncommon for married women to consent that their property may be mortgaged, or sold, in order to relieve their husbands from the pressure of embarrassing debts. The daughters of this plaintiff may well have felt alarmed at the situation of their father's affairs, and were quite justified in asking their mother to at least secure them a home, by a conveyance which would put it out of the power of their parents to sell or incumber their homestead even if they should desire to do so. We cannot say that a request of the daughters in such circumstances was unreasonable or unwise. As they executed and delivered a deed to their mother for a life estate in the property simultaneously with the deed to themselves, they thus secured a home to their aged mother as well as to themselves. The plaintiff admitted, and so testified, that the deed was read to her by Mr. Keiper before she signed, and it appears also by her testimony that both she and her husband

executed and acknowledged the deed, showing that her husband not only consented to it, but deprived himself of his curtesy in the property. It cannot be denied, therefore, that the conveyance was made consciously, advisedly, without undue influence or importunity, and with a full knowledge of its effect, if the case were to be adjudged by the plaintiff's testimony alone. But the other testimony, both for the plaintiff and defendants, confirms and completes the record against the plaintiff's claim. Her son, Luther M. Simon, testifying on her behalf, said: "I first knew of this deed at noon or in the evening of the day it was signed. My impression is it was at the dinner table. I learned it from my mother herself. . . . . She said to me after the rest had left the table, 'Oh! Lute, I gave the girls a deed to this property. . . . I only done it for protection.' I think that was the word she used." As this occurred on the same day the deed was executed it cannot be said that she did not know, and was not fully conscious of what she had done.

Samuel Keiper, the husband of one of the daughters, testified for the defendants, as follows: "On August 26, 1889, I called at the house of Mr. John B. Simon. Saw Mr. Simon, Mrs. Simon, and Annie and Clara. They were in the parlor. This was probably about 9 o'clock in the morning. Father and mother said they had concluded to give the girls the home and directed Annie to go to his office and ask his clerk for the old deeds. In a short time Annie returned saying the deed could not be found in the office. Then search was made by mother and the deed was found in the bureau drawer upstairs among other papers and brought into the parlor. . . . This deed was shown to me by mother or father I suppose. I was instructed to take it up to Mr. Jordan's office and have a deed made out to the girls— Annie, Clara, and Emma. Mr. Jordan was an attorney who did business for father and mother — I mean Mr. and Mrs. Simon." After saying that Col. Jordan was not in and that Mr. Wolf, who was in Mr. Jordan's office and attended to his business, wrote the deed, he said further: "After the deed was written I took it to Mr. Simon's house and handed it to Mr. and Mrs. Simon. They were in the parlor at that time. . . . I saw Annie read the deed to Mrs. Simon. I don't know who were present when the deed was read, but I remember Annie

reading the deed to Mrs. Simon in the corner of the window. I think that was just before dinner, about 12 o'clock. . . . After dinner . . . . about two o'clock, Mr. and Mrs. Simon and I were sitting in the parlor, and Annie and Clara, when Mrs. Simon remarked. She said 'I thought I would liked to have told Luther before I signed the deed.' She said Luther is uncertain as to his coming as it is now 2 o'clock, and he may not come before to-morrow, and Mr. Simon said, 'Yes, Moore, you go for the man,' meaning an alderman — alderman Jackson. I knew he meant alderman Jackson because I had gone for him before to take acknowledgments. I immediately went to alderman Jackson's office and asked him to come over to the house to take an acknowledgment. He came and he asked Mrs. Simon if he should read the deed to her and she said 'No.' She knew what it was. I saw her sign the deed and also saw Mr. Simon sign it. . . . After the deed was signed, Mrs. Simon handed it to Annie. I said nothing whatever to induce them to sign this deed." The witness also testified that he never made any statements to Mrs. Simon or Mr. Simon nor to Annie that Mrs. Simon's property could be taken for her husband's debts, and that the family all understood that it could not be done.

The daughter, Annie E. Simon, testified thus : " I remember the circumstances relating to the making of this deed. I wanted mother and papa to give me something in their lifetime which no one could dispute or doubt. I asked my mother in the presence of my father and sister Clara if she intended that, the house we now occupy, for the girls. She said, 'Yes.' I said, 'Then, mother, give it in your lifetime and there will be no trouble.' This conversation occurred on Saturday afternoon before the making of the deed. She turned to my father and said : 'Are you willing the girls should have this,' and he said 'Yes, mother, I am.' My father turned and said to me, 'You go for Mr. Jordan and have the deed made.' I hesitated because I didn't want to go to the lawyers, and I said, 'wait papa, let me write for Moore,' that is Mr. Keiper, 'he knows more about these things.' " After saying she wrote to Keiper and that he came on Monday, and Mr. Simon told him to go to the mill and get the old deed, and that he did so but could not find it, she proceeded : " Then mother brought it downstairs. She had it upstairs in her drawer. She went upstairs alone for

the deed. She was alone when she brought it down. . . .
When mother returned she handed the deed to papa and he
gave it to Mr. Keiper and he was told where to take it. I think
my father told him. He was told to take it to Col. Jordan.
Col. Jordan was a lawyer who had transacted some business
for the family. After Mr. Keiper was told to take the deed to
Col. Jordan he left with it, and returned afterwards with it
about 11 o'clock and gave it to mother. Papa read the deed
first and then he handed it to me and I read it to mother. . . .
I don't think mother made any special remark about it. . . .
The deed was executed a little after 2 o'clock on Monday,
Aug. 26, 1889. I think it was mother said she would wait un-
til Lute would come in, which was about two o'clock ; that she
did not want to displease him. She waited and he failed to
come. Then she said : 'It is my own. I will do as I please.
I want you girls to have it.' Mr. Keiper then went for the
alderman. . . . He came and took the acknowledgments. . The
deed was given to me by my mother. . . . I had no conversa-
tion with mother relative to her property being subject to
father's debts."

Clara L. Simon, another of the daughters, testified : " I heard
mother speak of her intentions in reference to this property
prior to the time she made the deed for it. . . . It was within
two or three months before the execution of the deed. She
said she always wanted it for the girls. That was the last con-
versation I heard on this subject prior to the Saturday preced-
ing the Monday on which the deed was made. . . . I heard her
speak of it before that but not very often, as we were not in
the habit of talking business affairs at home. By we, I mean
the family—father, mother and the daughters. She always
said she wanted it for the girls. I was present on Saturday
afternoon before the deed was made, and I heard sister Annie
ask mother at that time if she wanted us to have the property,
she should give it to us now. That is as near as I could recall
the words. My father, mother and sister Annie were present
in the sitting-room at home. My mother turned to my father
and asked him if he would have any objection to her giving it
to the girls, and father said ' No, give it to them.' Then my
father said to sister Annie, ' Go to Mr. Jordan's office and have
a deed made out.' " The witness then proceeded to detail what

took place on Monday substantially as the daughter Annie.had testified, including the fact that the mother went upstairs to get the old deed and brought it down. She also said : " The deed brought back by Mr. Keiper was read to Mrs. Simon. My sister Annie read it in the parlor. I was present when it was read."

The foregoing is practically all the testimony in the case in relation to the deed and the manner in which its execution occurred. We are unable to discover in it all, any of the elements which are so essential to equitable intervention. There is no evidence, not the least, of any exertion of undue influence in the procurement of the deed. It is beyond question that the deed was the voluntary and intended act of the grantors for reasons which, we are constrained to say, we regard as good and wise reasons for making the conveyance. Both the parents were aged and had in the natural course of events but few years to live. Repose and quiet, especially in so important a matter as the maintenance of their home, were of the utmost consequence to both. The transaction as it was made, secured them in this respect beyond all peradventure. It did not interfere in the least degree with the possession or continued use of the property just as they had enjoyed it for many years. The return deed for the life estate was executed at the same time with the deed to the daughters. The evidence is most full and satisfactory on that subject, and that deed fully secured the parents in the possession of the property. Then, too, the grantees in the deed were the grantor's own children, two of whom had lived with their mother during the whole of their lives, and were now in middle life and without protectors. They were eminently objects of parental solicitude and most deserving subjects for the exercise of a bountiful provision for their future maintenance and support. At the death of their parents they would be deprived of the pecuniary support which they had always received from their natural protectors ; they were too old to engage in any kind of business, and they were women, and not men. Surely persons so situated are fairly entitled to whatever provision can be made for them by loving parents who are so shortly to leave them forever. As between such parents and such children the law makes no presumption of undue influence which the children are bound to explain, in

order to obtain the benefit of a voluntary conveyance of property to them. The parental relation alone is enough to rebut any such presumption, and when to that is added the consideration that the conveyance provides a home for children who are otherwise helpless, and who would be liable to be ejected from their home under the operation of the intestate laws, we may regard the transaction rather as the performance of a high moral duty by the parents than as a suspicious acquisition on the part of the children. In the course of nature these daughters would, under the intestate law, shortly become the owners of three fifths of the property in any event, and the real subject of the contention therefore becomes substantially only the two fifths, instead of the whole, of the property in dispute. But without lingering upon this line of thought, it is only necessary to say that we regard the conveyance of this property as in all respects conscionable, wise and just, that it was the free, voluntary act of the parents, not obtained by any degree of undue influence or even importunity, that the deed was prepared at the office of counsel who had represented the father in his business transactions, and who was selected for this purpose, and that there is no taint, or suspicion, of unfair advantage, or imposition, or of any wrongful action on the part of these children in obtaining the deed in question.

The decree of the court below is affirmed and the appeal dismissed at the cost of the appellant.