Lochinger *v.* Hanlon, Appellant.

Argued March 26, 1943. Before MAXEY, C. J.; DREW, LINN, STERN, PATTERSON, PARKER, and STEARNE, JJ.

reargument refused August 12, 1943.

*Walter J. Wagner,* for appellant.

*Alex. A. Garroway,* with him *Campbell, Wick, Houck & Thomas, Roy I. Carson,* of *Carson & Porter,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, July 13, 1943:

The question raised in this appeal is whether plaintiff, an aged father with impaired hearing and other physical infirmities, made a valid gift inter vivos to his daughter of a joint interest in his savings account, with the right of survivorship. The account represents the major portion of his estate.

The action was instituted by a bill in equity brought by the father to set aside the alleged gift. The court below granted the prayer of the bill upon findings of fact and conclusions of law that the transaction had been induced by undue influence and false representations of the daughter. We are unanimously agreed that if this case were one in which the burden of proof rested upon plaintiff to establish by affirmative evidence the existence of coercion or fraud, or if the record showed that plaintiff had, of his own free will and with full understanding, created this joint account with the incident of survivorship, the evidence would not be sufficiently clear and precise to support the decree. In the

opinion of the majority of this court, however, the evidence is sufficient to show that the transaction was entered into by the father under a mistake of fact and was also sufficient to cast upon the daughter the burden of proving that the gift was the free and voluntary act of the father, which burden she has failed to sustain.

Plaintiff is a man more than seventy-seven years of age, illiterate, unable to read or write except to sign his name, and without any formal schooling. Tests made by the hearing judge in the courtroom established that, "his hearing is so bad that it is difficult to make him understand what is being said"; and by the admission of the defendant, this deafness has existed for thirty years. For thirty-four years plaintiff and his wife kept the greater part of their savings in a joint bank account with survivorship at the Fourteenth Street Bank in Pittsburgh. At the time of the transaction here involved, the amount on deposit was $11,951.11. Apparently most of the banking was attended to by plaintiff's wife because the bank officials testified that they remembered her but did not know the plaintiff by sight.

On September 10, 1941, plaintiff's wife, with whom he had lived for fifty-five years, died. In addition to her husband, she was survived by a daughter, the defendant, a son and six grandchildren, children of a deceased son. Plaintiff and his wife had lived alone. Defendant, a married woman, resided with her family about a mile and a half from her father's home. Upon the death of his wife, plaintiff requested his daughter to come to his home and remain until after the funeral, which was held on Saturday, September 13, 1941. Defendant testified that she stayed overnight, and on Sunday afternoon, after family visitors had left, her father asked her to accompany him on the following morning to an attorney's office, "to take the will [his wife's] in" and "to see about his bank book." She testified that this was the only conversation that took place between the father and daughter before they went to the lawyer's

office and the bank on Monday morning. Plaintiff's testimony was that his visit to the lawyer's was prompted by his daughter, who wanted him to make his will.

On Monday morning the will of plaintiff's wife was probated, and father and daughter went alone to the bank to change the name on the account. It is to be noted that nowhere in plaintiff's testimony or in defendant's testimony does it appear that plaintiff indicated prior to the transaction that the change was to be effected by substituting the name of the daughter for the mother. His testimony was merely that he went to change the account *from his wife's name.* What transpired at the bank requires careful consideration. Of one thing there is no dispute; the account, then the exclusive property of plaintiff, was closed and a new account was created of which plaintiff and defendant were joint owners with the right of survivorship. It is conceded that both plaintiff and defendant signed the card or application for the account in its present form. The daughter testified that when she and her father entered the bank, he stated to the bank officials that he "wanted to put my [defendant's] name on that book the same as Mom's, meaning my mother." This testimony was partially corroborated by a bookkeeper, who said that plaintiff asked that defendant's name be "added to the account." Defendant asserted that this was done without any prompting upon her part. The president of the bank, who was called by the bookkeeper to assist in the transaction, admitted that he retained no recollection whatever concerning it, but said that because his name was affixed as a witness to the card, he felt certain that he had fully explained the transaction to plaintiff, as he had been accustomed to doing in similar transactions. He did say, however, significantly: "I imagine Mrs. Hanlon [the defendant] did the more talking because he [plaintiff] seems not to catch on quickly, and I thought he might not hear quite properly." Both bank officials testified that they were not

then aware that plaintiff was extremely deaf or that he could not read. The card containing the terms of the deposit was not read to him. The bookkeeper testified that the nature and effect of the transfer were explained to plaintiff. However, both he and the president admitted that they had not raised their voices above a normal conversational tone because they did not realize the extent of plaintiff's impairment of hearing. Both *"assumed"* that plaintiff fully understood the transaction because he signed the card and "seemed agreeable." There is no evidence that plaintiff said anything to indicate that he understood the transaction. Defendant herself said, regarding the statements of the bank officers to her father, "I don't know what they talked about. I didn't pay any attention."

Plaintiff vigorously maintained on the witness stand that when he permitted his daughter's name to be added to the new account, it was definitely *not* his understanding that she was to have the balance of the fund by survivorship upon his death. He said that he knew he had such an arrangement in the joint account with his wife. As he said, however, ". . . me and Mom was always on, but *that was a horse of a different color, that was our own.*" The mutuality of the financial arrangements between plaintiff and his wife was consistent not only with their marital relationship, but with the fact that the land upon which plaintiff erected the farmhouse had been bought by her. He said, "She owned the ground. She bought it and we worked between us, me and Mom, we worked for fifty-five years." Speaking of the account itself, he testified: "We worked for that together, me and Mom both for the last fifty-five years." Plaintiff testified that he did not want originally to put his daughter's name on the account but that "she preached my head full till I didn't know what I was doing" and that he finally agreed to let her do so "after she had me so, I didn't know what I was doing, and *I didn't realize at the time, I didn't realize at the time.*" He

denied that he knew defendant was to have the right of survivorship or that he so understood the transaction. He said that he was "confounded" and "upset" by his daughter's importunities and that he "did not understand much of what was done."

One joint withdrawal was made by plaintiff and defendant after this transaction. This withdrawal was made for the purpose of defraying the funeral expenses for plaintiff's wife. Some time thereafter he discovered the terms of the deposit and went to the defendant to request that her name be removed from the account. The defendant's reply was significant. She made no assertion that her father had made a gift to her or that she was entitled by past services, or particular affection, to the funds. Indeed, there is no evidence whatever that this daughter was her father's favorite, or that she had rendered any considerable services to her parents. Her answer to her father was "Well, Pap, you put it [her name] there, and it is up to you to take it off . . ." Her attitude was also apparent in her testimony at the trial, "Q. Why wouldn't you take it off? A. Well, because he put it on. Why should I go to that *expense*? Q. Expense, there is no expense. A. Why should I *bother* about it? He did it himself, not me. Q. Well are you willing to take it off? A. Well I feel this way. I should have my equal share the same as the rest of the children now because he has been influenced . . ." Such testimony is hardly consistent with the argument that she permitted her name to be added to the account out of solicitude for her aged father. The protection of a joint account could have been afforded him, of course, without a provision that this, the bulk of his estate, should pass absolutely to his daughter upon his death to the exclusion of his other heirs. According to the widow of the deceased son of plaintiff, defendant volunteered to her the information that she had caused the transfer to be made in order to prevent her brother, George, from receiving any of the money and to "protect" the wit-

ness's sons, although the manner of that protection was not explained. Defendant did not deny this testimony.

The signed application card represented a prima facie gift inter vivos by plaintiff to his daughter. Nothing further remained to be done to complete the transfer, and therefore the *primary* burden of establishing its invalidity rested with plaintiff. In *Weber v. Kline,* 293 Pa. 85, former Chief Justice KEPHART said: "The chief grounds on which gifts or bequests are most frequently attacked are lack of capacity and undue influence. Generally speaking, the burden of showing both incapacity and undue influence rests on those asserting the facts. *But this rule does not apply where the relation of the parties to each other, or some vicious element in connection with the transaction, is such that the law compels the recipient of the bequest or gift to show that it was the free, voluntary and intelligent act of the person giving it.* Though there may be capacity to give, the law, nevertheless, casts this burden on the recipient. The factors which bring this rule into action are fraud, *confidential relation,* weakness of mind not otherwise incapable, and gross deception. *When these appear in the course of an investigation as to the validity of gifts, the burden of proof will immediately shift."*

In the present case plaintiff's evidence was sufficient to shift the burden of proof to the defendant and to require her to prove that the gift to her was made voluntarily, and without coercion, by her aged father. As stated in *McCown v. Fraser,* 327 Pa. 561, 564, "But if it is shown that the donee of a gift stood in a *confidenial relation* to the donor, the burden rests upon the recipient to prove that the transaction was in all respects fair and beyond the reach of suspicion: *Darlington's App.,* 86 Pa. 512; *Matthaei v. Pownall,* 235 Pa. 460; *Thorndell v. Munn,* 298 Pa. 1."

The rules relating to determination of confidential relationship are set forth in the last cited case, where it is pointed out that, as between parent and child, the

existence of the relation is a question of fact to be determined from the evidence. It was said at page 565: "In general it may be said that a confidential relation will be deemed to exist whenever the relative position of the parties is such that the one has power and means to take advantage of, or exercise undue influence over the other: *Darlington's App.*, supra; *Miskey's App.*, 107 Pa. 611; *Longenecker v. Church*, supra. In such case the party in the superior position is obligated, legally as well as morally, to act with the most scrupulous fairness and good faith, and to refrain from using the trust and confidence reposed in him to secure an advantage for himself: *Null's Est.*, supra. Hence, when it appears that, by an inter vivos transaction, he has obtained a gift or other benefit from his confidant, he must, if the matter is questioned, prove affirmatively that it is unaffected by any taint of undue influence, imposition or deception: *Darlington's App.*, supra; *Stepp v. Frampton*, 179 Pa. 284; *McConville v. Ingham*, 268 Pa. 507; *Null's Est.*, supra. Such a transaction will be condemned, even in the absence of evidence of actual fraud, or of mental incapacity on the part of the donor, unless there is full and satisfactory proof that it was the free and intelligent act of the donor, fully explained to him, and done with a knowledge of its consequences: *Matthaei v. Pownall*, supra; *Corrigan v. Conway*, 269 Pa. 373; *Williams' Est.*, 299 Pa. 440."

When the evidence is sufficient to establish a confidential relationship between the donor and the donee, the burden is then upon the donee to show "that all was fair, open, voluntary and well understood," *McConville v. Ingham*, 268 Pa. 507. In that case Justice SIMPSON said at page 518, quoting from our decision in *Stepp v. Frampton*, 179 Pa. 284, 289: " 'But when the relation existing between the contracting parties appear to be of such a character as to render it certain that they do not deal on equal terms, but that on the one side, * * * *from overmastering influence, or on the other side, from*

*weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, then the burden is shifted, and the transaction is presumed void, and it is incumbent on the party in whom such confidence is reposed . . . to show affirmatively that no deception was used, and that all was fair, open, voluntary and well understood.* This principle is of very general application . . . and the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise.' The rule is stated to the same effect in 14 Am. & Eng. Ency. of Law (2d ed.) 1036; 39 Cyc. 1219."

It is apparent, therefore, that the authorities in this jurisdiction are too abundant and too clear upon the subject of the burden of proof, in the case of confidential relationship, to admit of any question. It is also clear that upon the facts of this case, plaintiff's testimony was sufficient to cast the burden of proof upon his daughter to show that the gift was made of his own free will and with his full understanding. The record shows that plaintiff was aged and infirm, that his hearing was seriously impaired, that he was without schooling and illiterate. The transaction occurred within five days after the death of his companion for fifty-five years and within two days of her funeral. He testified that he did not intend to make this gift to defendant and that he was prevailed upon by her to do so through her repeated importunities. He testified (and it is conceded) that the card which he signed was not read to him, and he says that he did not understand what took place at the bank, and that he did not know that by the transfer she obtained the right of survivorship. The cumulative effect of his testimony was sufficient to show that the relation existing between himself and his daughter at the time of the transaction was such that they did not deal upon equal terms, and therefore the burden was upon her to show that she acted with scrupulous fairness and good faith and that she did not abuse

the confidence reposed in her by her elderly parent. It is true that plaintiff's testimony was uncorroborated, but there can be no doubt that it was competent and sufficient. The chancellor who heard the witnesses and had an opportunity to judge of their truthfulness, decided that the daughter had offered inadequate evidence to sustain her burden of proof. As stated in *Weber v. Kline*, supra: "Even if we were disposed to think otherwise, we are met with this barrier: 'The findings of a chancellor based on evidence and approved by the court below, must be given the same weight as the verdict of a jury and will not be disturbed on appeal: *Glenn v. Trees*, 276 Pa. 165; *Miller v. Trust Co.*, 285 Pa. 472; *Houghton v. Kendrick*, 285 Pa. 223': *Kern v. Smith*, 290 Pa. 566, 569." The defendant has given no reason for the alleged gift to her. She has not shown that her father understood the transaction. She has not established why he should desire to benefit her to the exclusion of his other heirs, and she has not shown that he intended that she should take the fund by survivorship. Upon this ground alone the decree of the court below should be sustained.

The facts in the *McConville* case were analogous to the facts here present. There the plaintiff was a ninety-two year old woman, and the defendant was her adult granddaughter. In view of the facts showing that the parties stood in a relation of confidence, and that they were not dealing upon equal terms because of the infirmities and age of the donor, it was held that the burden of proof was upon the granddaughter to show that the transaction was fair, open, voluntary and well understood. The present case, however, is stronger because here the facts were so found by the chancellor and the court below, whereas in the *McConville* case the decree of the lower court was in favor of the donee.

Even if this record did not establish a confidential relationship between the parties and disclose circumstances sufficient to cast the burden of proof upon the

defendant, plaintiff's testimony clearly shows that he entered into the transaction under a mistake of fact regarding the terms of the deposit. Compare *Co. of Schuylkill v. Copley,* 67 Pa. 386; *Stauffer v. Gebhardt,* 103 Pa. Super. 300. It is to be noted that this was in no sense a contract entered into between father and daughter. It was a gift by the father to the daughter, evidenced by a contract of deposit with the bank. The bank is not a party to these proceedings. Plaintiff has testified that he was unable to read the card, and defendant's witnesses have admitted that it was not read to him. Even assuming that plaintiff could have understood the incident of survivorship, which is by no means certain in view of his advanced age and illiteracy, there is no evidence whatever to refute his testimony that he did not know the card contained a provision for survivorship. Obviously all joint accounts do not contain such a provision, and there is no reason to suppose that the addition of defendant's name to his upon the new card should have conveyed to him the knowledge that he was thus disposing of the greater part of his estate. It is an elementary principle of law that a clear and unmistakable intention on the part of the donor to make a gift of his property is an essential requisite of a gift inter vivos: *App. of Waynesburg College,* 111 Pa. 130; *Walsh's App.,* 122 Pa. 177; *Flanagan v. Nash,* 185 Pa. 41; *Reese v. Phila. Tr. Co.,* 218 Pa. 150; *Ashman's Est.,* 223 Pa. 543; *Maxler v. Hawk,* 233 Pa. 316; *Turner's Est.,* 244 Pa. 568; *Campbell's Est.,* 274 Pa. 546; *Chapple's Est.,* 332 Pa. 168. This fundamental principle has been widely accepted in other jurisdictions: 28 C. J. 627. Here the only evidence of plaintiff's intention to make the gift was his signature upon the card. This evidence is of little value in view of plaintiff's admitted inability to read and in view of the evidence indicating that the card was not read-to him and that he did not understand its nature. The testimony of the bank officials, based upon assumptions, does not show that they were able to make them-

selves understood by him, but does show that they were unaware of his illiteracy and impairment of hearing. While it is true that the burden of proof is upon one who attempts to establish a mistake of fact as the grounds for setting aside an executed transaction, we are of the opinion that plaintiff's testimony clearly shows that he never intended to make a gift to defendant of the fund upon his death. Upon this ground also the decree of the court below could be affirmed, but, as we have pointed out above, the circumstances of the case were such that the burden was upon defendant to establish the validity of the gift rather than upon plaintiff to show its invalidity.

The decree of the court below directing the Fourteenth Street Bank to cancel the joint savings account must be modified because the bank is not a party to the proceedings. The plaintiff is the sole owner of the amount to the credit of the plaintiff and defendant in the Fourteenth Street Bank, and the defendant has no right or property therein; payment by the Fourteenth Street Bank to the plaintiff, or on his order, shall be a complete discharge of the bank's obligation. A copy of this decree shall be served by the plaintiff on the bank. So modified the decree is affirmed; costs to be paid by appellant.

DISSENTING OPINION BY MR. CHIEF JUSTICE MAXEY:
What this plaintiff is attempting to do in this action is to repudiate his written contract and if the law as laid down in a long and consistent line of cases is adhered to by this court his attempt will be frustrated. Paraphrasing slightly what Chief Justice J. HAY BROWN said in his dissenting opinion at page 348 in *Johnson's Estate*, 249 Pa. 339, 94 A. 1082: While it may be gratifying that this 77 year old plaintiff regains sole control of this bank account, "in saving it [for him] the law has not been saved".

The following propositions are under our law incontestable:

First: The "deposit card" admittedly signed by the plaintiff and this defendant constituted a written contract. This Court speaking through Mr. Justice LINN so held in a similar case in *Mader et al. v. Stemler et al.,* 319 Pa. 374, 179 A. 719. There we declared a changing on a bank's signature card, of the bank account from Frank Stemler to "Frank Stemler or Jean Stemler" (p. 376) to be (p. 378) an "agreement creating a joint interest with the right of survivorship". On page 379 we referred to it as "a writing signed by the parties, completely expressing the intention to vest by assignment a present joint interest in the chose in action with the right of survivorship". In that case an attempt was made to change the prima facie import of the contract by impressing a parole trust upon it, but we held that "the evidence is insufficient to support such a contract. The measure of proof required to show a trust of that character must be 'clear, precise and unequivocal'. In this case the evidence does not meet that measure." That case clearly rules this case.

The second proposition is, as was stated in the opinion just cited, that a written contract cannot be repudiated or altered by one party to it except on the ground of "fraud, accident or mistake" and the proof of such an averment must be "clear, precise and undubitable". This was held in the following cases and in many others, and there are no decisions to the contrary: *Honesdale Glass Co. v. Storms,* 125 Pa. 268, 17 A. 347; *Sutch's Estate,* 201 Pa. 305, 50 A. 943; *Foley, Exr., et al. v. Wasserman et al.,* 319 Pa. 420, 179 A. 595.

This Court has unequivocally declared, as we did in *Gianni v. Russell & Co., Inc.,* 281 Pa. 320, 126 A. 791: "We propose to stand by the integrity of written contracts." In *Berardini v. Kay et al.,* 326 Pa. 481, 192 A. 882, this Court rejected a claim of "a citizen of foreign birth, unable to speak English fluently" that "when he signed the order he failed to read it" and therefore was not bound by it. We said: "The evidence offered by ap-

pellant is equivocal [and] . . . suggests the nebulosity of his own conception of his claim."

If any other example of this Court's fidelity in the principle of upholding written contracts is needed, see *Pender v. Cook,* 300 Pa. 468, 150 A. 892, where we said parol evidence to change, affect or lessen the legal liability occasioned by the manner in which names are placed on commercial paper can be considered only where fraud, accident or mistake is shown, and must be of the same quality as that which would reform a written instrument.

In the instant case plaintiff admitted (20a) that he agreed to have his daughter's name "on the book". He admitted his signature on the bank deposit card (35a) and answered "Yes" to the following question (39a) : "Well, you said you and your daughter Christine went to the bank to have the account changed from your wife's name." If that language does not indicate that plaintiff *intended* to make a gift to defendant it is difficult to conceive of language that would so indicate, and if a transaction like this bearing the signature of the parties can be set aside on the later testimony of one of them that he didn't understand what he was doing the integrity of all contracts is gravely menaced.

The burden of proof was on this plaintiff to "get out from under" the obligation of the written instrument and this burden he utterly failed to meet. His own testimony was nebulous and intrinsically inconsistent. In fact, taken as a whole it went far in corroborating what the defendant herself and the bank officers testified to, that is, that the plaintiff came into the bank to have his account transferred to himself and his daughter jointly, as it had been held jointly by himself and his wife for thirty-seven years and up until his wife's then recent death. Lochinger knew exactly what having such a joint interest in a bank account meant, as to the right to withdraw from such an account and the right of survivorship in such an account. He himself had just been

the "survivor" as between himself and his wife in their joint bank account. The deposit agreement was signed by both Lochinger and his daughter in the presence of the bank president and the bookkeeper. The latter testified that "they [Lochinger and his daughter] came in together, went up to the window and he asked that her name be added to the account". The bank president testified: "I am satisfied that he knew what the transaction was because I witnessed it and I asked the question." He further testified that he "wouldn't sign anything of that sort unless he was satisfied or assured the person knew what he was about". In answer to the question whether he knew the plaintiff was "hard of hearing", he said: "Well, we have taken, usually persons that are up in years we try, I try to make myself clear to them. I was a teller formerly and I handled a great many people of that sort and I do that."

The majority opinion stresses the fact that the plaintiff was hard of hearing. We have no evidence as to *how* "hard" of hearing he was. No physician was called to testify as to its "hardness". It also appears in the record that this plaintiff after his wife's death consulted with Attorney Gilfillan and the attorney told him: "Charlie, these two bank accounts are yours, and you don't have to pay any inheritance tax on it." There is no evidence of his having any difficulty either in hearing or in comprehending what Attorney Gilfillan said, for the lawyer then obtained a short certificate in the courthouse, gave it to the plaintiff and said to him: "You won't have any trouble transferring that account there." Plaintiff then went to the bank where one of these accounts was and there he conferred with the president of the bank and the bookkeeper and there signed the new deposit agreement and then "he pushed the card over to" the defendant and handed her "the pen to sign" her name to it, thus creating the joint account. If the plaintiff was so physically incapacitated that he could not hear and so mentally incapacitated that he could not

comprehend a simple business transaction, Attorney Gilfillan would certainly have been a competent witness to prove those facts. He was not called as a witness, as he properly could have been, for he is in no way (so far as appears in the record) connected with this present case.

The plaintiff's alleged "deafness" is not even a factor of any legal consequence in this case. Even a deaf and dumb man is as much bound by his written contracts as anyone else, and if he alleges "fraud" in securing his signature to the alleged contract he must prove his allegation by evidence of the same clarity, precision and indubitableness as anyone else.

The fundamental error in the majority opinion is, as I see it, in treating this case as though *no* written contract existed between the parties, and as though there was merely an oral gift inter vivos between a father and his daughter. Starting with this erroneous assumption the majority opinion then argues, first, that the burden of proof is on the daughter, i. e., the defendant, second, that she has failed to sustain this burden. Not only is this *basic assumption erroneous, but propositions 1 and 2* are *also erroneous.* The assumption is erroneous for there certainly is a *written contract* in this case. The plaintiff's evidence to nullify it on the ground of "coercion, intimidation and undue influence" (i. e., "fraud") completely fails to measure up to the standard of proof always hitherto required by this Court in such cases. The majority opinion says: *"It is true that plaintiff's testimony was uncorroborated."* (Italics supplied.) This being the fact, *this case stands alone in Pennsylvania as being the only case* (at least since *Gianni v. Russell & Co., Inc.,* supra, in which we declared our intention to *uphold* "the integrity of written contracts" against attempted parol repudiation of them) where one party has been permitted to repudiate his written contract *on his own uncorroborated testimony.*

Proposition No. 1 is erroneous for this Court has repeatedly held that "confidential relationship" does

not arise *merely* from the fact of *family* relationship, and in cases of gifts inter vivos between parent and child the presumption favors the validity of the gift and the *burden is on him or her* who attempts to challenge its validity. In *Hand's Estate,* 315 Pa. 238, 172 A. 666, we said: "Business dealings between parent and child or gifts from one to the other are not prima facie to be considered fraudulent, and those who attack such transactions assume the burden of furnishing clear proof of fraud": (citing cases) . . . ". . . As between parent and child there is a presumption of fairness and not of fraud:" *Northern Trust Co. v. Huber,* 274 Pa. 329, 118 A. 217. The general rule is that "In the absence of a relationship between the parties to a transaction which tends to give one dominance over the other, undue influence must generally be proved by the party setting it up and will not be presumed. Under such circumstances inadequacy of consideration, although highly material to the issue, usually will not constitute such proof, nor will the age, infirmity or weak-mindedness of the promisor or transferor of itself establish a case or defense based thereon . . .": Williston on Contracts, Vol. V (Rev. Ed. p. 4541, Sec. 1623A). This has long been the rule in Pennsylvania. In *Null's Estate,* 302 Pa. 64, 68, 153 A. 137, we said: ". . . Mental weakness, old age, ignorance and so forth, is not assumed as an element, nor is undue influence a necessary part except so far as the ability to exercise undue influence is implied in the very conception of confidence: Pomeroy's Equity Jurisprudence, Vol. 2, Sec. 955." In *Null's Estate* we upheld a gift inter vivos of a woman 87 years of age to her daughter. We said: "The evidence to sustain" the relation known as confidential "must be certain; it cannot arise from suspicion or from infrequent or unrelated acts; care must be used not to confound acts springing from natural love and affection with confidential relations." "The mere existence of kinship does not, of itself, give rise to confidential relation": *Clark v. Clark,* 174 Pa. 309, 336, 34 A. 610.

That this plaintiff knew exactly what was the nature of the transaction at the bank is crystal clear from the evidence. The defendant testified: "He [the plaintiff] said to the cashier that he wanted to put my name on that book the same as mom's, meaning my mother". When father and daughter left the bank, the father said: "Well, the rest of the family can't clean me out now." The bookkeeper testified: "We spoke to them [the plaintiff and the defendant] and explained the right of survivorship, that each, that both, would have to sign." He also testified that the father "asked that her [the daughter's] name be added to the account and I asked him whether it should be 'and' [or] 'or' . . . and they wanted it 'and' ". The Court then asked the bookkeeper: "Who did the talking?" and the witness answered: *"Mr. Lochinger came in and asked for that."* (Italics supplied.)

The president of the bank did *not* testify (as the majority opinion claims) that he retained "no recollection whatever concerning it" i. e., this transaction. His "no recollection" related only to whether or not Lochinger "said anything at all". He remembered that "the old gentleman was agreeable and nodded his head and I think he understood all we asked him . . . I also told him . . . whichever one died first, the other one would be complete owner of it and there was no objection to it by either one." He said he had "no vivid recollection" of the "scene".

Lochinger himself did not accuse his daughter of any "fraud" in the matter. He said she "preached" him into "letting her sign her name on it" (the deposit agreement). Nine days after this joint account was established he and his daughter went to the bank and jointly withdrew from the account $951.11. He made no criticism of the joint account *at that time* and made no attempt to change it. Lochinger did not deny signing the deposit agreement with his daughter. He was only "pretty sure" that what was on the deposit agreement

was not explained to him before he signed it. He was asked: "If you had known those words [about the survivor becoming the absolute owner of the account] were there would you have signed the card?", and his answer was: "I don't know whether I would or not." The clear import of this man's testimony is that his daughter "preached" him into putting her name into the place on the joint account which her mother occupied for 37 years before her death, that the father was willing that this be done so that "the rest of the family can't clean me out", that he went to the bank for this purpose and that after the bank officers explained to him what the significance of his and his daughter's signing the deposit agreement was, he signed it with a full appreciation of its legal significance, for he was not a stranger to a joint account with the right of survivorship. His affirmative answer to the question put to him by his own attorney and quoted earlier in this opinion proves that he *knew exactly what he was doing at the bank*. Evidently some one got him to change his mind about this matter many months afterwards. It was nearly ten months after this plaintiff established, by his own signature (and his daughter's) this joint account before he started this action to repudiate it. The law protecting the integrity of written contracts has reached a deplorable state if the signers of such contracts can slink out of their obligations by twice repeating in court: "I didn't realize at the time—I didn't realize at the time" and that he was "upset" over it.

The majority opinion says "there is no evidence whatever that this daughter was her father's favorite or that she had rendered any considerable services to her parents". What pertinency this has to this case remains completely obscure. There is nothing unusual in a parent making a gift to a child. We recently had a case in this court where a father gave his children several millions of dollars before his death. This plaintiff had only two surviving children, a son and a daughter, and it is on

record that the mother left the son $4,000. She left the daughter the family farm, subject to this $4,000 legacy to the son. For this defendant to profit by this joint account she will have to survive her father, a thing she is likely to do, but there is no certainty that she will not precede her father in death as Henry Ford's only son recently preceded his 81 year old father in death. There is nothing suspicious or unusual in an aged father having his bank account, after his wife's death, placed in the names of himself and a child jointly. This was a natural thing to do here, for the account had been a joint one for 37 years. After a man loses his wife by death, an adult daughter often takes her mother's place as her father's counsellor, and frequently to his great benefit.

All the cases cited in the majority opinion about the burden of proof in cases where the benefited party stands in a "confidential relation" to the giving party are *wholly inapplicable to this case,* for it is completely settled in the law that family relationship does not in itself either prove or raise a presumption of confidential relationship, as the cases we have cited clearly demonstrate.

In *Worrall's App.,* 110 Pa. 349, we said: "There is nothing in the relation of parent and child, or other near relation, to preclude one from accepting a benefit from the other in the shape of a gift, or of a contract upon more advantageous terms than would have been granted to a stranger, and the fact that such a gift has been conferred, or contract made, will not warrant an inference that it has been procured by undue influence." In *Smiles et al. v. Daube,* 130 Pa. Superior Ct. 565, 571, 198 A. 457, the Court said: "The parental relation here existing is sufficient to rebut any presumption of undue influence upon the part of the appellant and the natural love and affection existing between a mother and a son is a sufficient consideration: *Carney v. Carney,* 196 Pa. 34, 46 A. 264, and *Simon v. Simon,* 163 Pa. 292, 29 A. 657." The decisions just cited are obviously based on the well known fact that gifts are normally made not to strangers but to

persons who stand in close relation to the donor, usually a family or blood relation. If gifts inter vivos are to be set aside because of the influence of affection all of such gifts could be declared invalid when the donor's affections have cooled and he demands that the gift be returned.

The case of *McConville v. Ingham et al.*, 268 Pa. 507, 112 A. 85, does not bear the remotest legal resemblance or logical analogy to the case at bar. *There* the plaintiff was 92 years of age, and the claimant admitted in her testimony that her grandmother was "weak and incompetent". Here the plaintiff is 77 years of age and it appears all through his testimony that he was neither "weak" nor "incompetent". In the *McConville* case this court found that "at no time did defendant say the money was a gift to her, or deny her alleged promises to return it . . . She did not keep her promises, and hence plaintiff filed the present bill in equity." In the instant case the testimony of the defendant, the plaintiff, and the bank officers clearly indicates that this father *intended* his daughter should hold the joint account with him and should take her deceased mother's place in the joint account. Lochinger himself said so by his answer "yes" to the question his own lawyer put to him and which is quoted above. No one accuses the daughter in *this* case of breaking *any* promises. In the *McConville* case the 92 year old woman was at the time of the transaction "crying, which evidenced her mental distress". Here the bank officers saw no indication that this father was in any kind of mental distress or that he was acting otherwise than on his own free will. In the *McConville* case we said: "There is no proof of the alleged gift except defendant's unsupported declaration, which is discredited by the contradictions appearing in her testimony." In the instant case the "proof of the alleged gift" is found in plaintiff's admitted signature on the deposit agreement, i. e., *the contract,* and the only "contradictions" found in the record are in the plaintiff's own testimony.

What the court said in the *McConville* case as to "burden of proof" relates only to those cases where there is no proof of a gift except the donee's own testimony and where the situation is such that the ownership of the alleged donor is presumed to continue. In the instant case the gift is evidenced by a writing signed by the "giver" and when he wishes to repudiate that writing he must under all of our decisions prove he was induced to sign his name to it by "fraud, accident or mistake" and the evidence to sustain his claim must be clear, precise and indubitable. The majority opinion virtually admits that the evidence in this case does not reach this high standard of proof when it says that "plaintiff's testimony was uncorroborated". Since it was uncorroborated it can *not* be "sufficient" (as the majority opinion asserts) *unless we are to ignore or repudiate our former long line of consistent opinions in precisely this class of cases.* The principle of stare decisis should be respected by the Courts and this is particularly true when they constitute *a rule of property,* as does the principle the defendant justifiably invokes in this case.

All the cases cited in the majority opinion about the necessity of "a clear and unmistakable intention on the part of the donor to make a gift of his property is an essential requisite of a gift inter vivos" are, except for *two* cases which *support* the view taken by this dissenting opinion, entirely without application to this case. For example, in *Appeal of Waynesburg College,* 111 Pa. 130, 3 A. 19, where an attempt was made to establish a gift inter vivos and a trust by making and delivering to the payee therein named a check for safe keeping as trustee for another, we said it could not be so established. In *Appeal of Walsh,* 122 Pa. 177, 15 A. 470, a depositor, in expectation of death, handed her deposit book to a friend, saying: "The money there is for my sister in Ireland but if I don't die I want it back". She died the next day. We held that the transaction did *not* constitute a valid donatio mortis causa. In *Flanagan v. Nash,*

185 Pa. 41, 39 A. 818, we held that under the agreement made in that case which was "either to draw", "there is nothing to show that if the defendant drew the money he could keep it as his own". In *that* case there was involved only the interpretation of a somewhat dubious agreement. *Here* the agreement is explicit that "the survivor shall be the absolute owner of the balance". The case of *Reese v. Phila. Trust, Safe Deposit & Ins. Co.*, 218 Pa. 150, 67 A. 124, cited in the majority opinion, fully supports the position taken in this dissenting opinion. There we held that where an elderly woman went to a bank vault, took out her securities and in the presence of a bank officer executed transfers to her nephew, a valid gift of the securities to her nephew *was made*, even though the donor retained access to the box where the securities were kept. The court said: "Can there be any question as to the legal effect of this transaction?" It answered this question "No" by its decree directing the bank to transfer the securities *to the nephew*. In *Ashman's Est.*, 223 Pa. 543, 72 A. 899, we simply held that where a father declared in writing that he gives certain bonds to his son but also provides in writing that the bonds are not to be used until after his own death and the father subsequently makes a will revoking all previous wills, the son was not entitled to the bonds. In *Maxler v. Hawk*, 233 Pa. 316, 82 A. 251, and in *Turner's Est.*, 244 Pa. 568, 90 A. 916, there was no writing whatever (as there is in the instant case) attesting the alleged gift. In *Campbell's Est.*, 274 Pa. 546, 118 A. 547, we held that where a decedent shortly before his death draws a check in favor of his brother for the exact amount of his deposit in a savings bank and declares to the person who witnessed the check that he wanted his brother to have the money, and directs that the check and bank book shall be put in an envelope addressed to his brother at the latter's post office, and placed in his (decedent's) satchel, and the brother presents the check for payment the day after decedent's death, the check

will be considered a gift inter vivos, if the evidence shows that there was no possibility that the brother obtained the check after the decedent's death. The facts in the case at bar make out a much stronger one for the claimant than do the facts in *Campbell's Estate*. In *Chapple's Estate*, 332 Pa. 168, 2 A. (2d) 719, there was no written agreement attesting the alleged gift inter vivos.

As we said earlier in this opinion, the majority opinion *fails to distinguish* the case at bar which rests on a *written* agreement, *from* the cases it cites where the alleged gift rested entirely on *parole*.

The majority opinion says, "Plaintiff is a man more than seventy-seven years of age, illiterate, unable to read or write except to sign his name, and without any formal schooling", and adds, "Tests made by the hearing judge [ELLENBOGEN] in the courtroom established that his hearing is so bad that it is difficult to make him understand what is being said; and . . . this deafness has existed for thirty years." This description probably fits thousands of citizens of this Commonwealh. Hitherto there has never been a judicially accepted rule that a person answering this description can repudiate his contract by such testimony as the plaintiff produced in this case and without a particle of corroboration. How Judge ELLENBOGEN "tested" this plaintiff's hearing does not appear, but in reading the record it is obvious that the respective attorneys had no difficulty in making the plaintiff understand the questions addressed to him. None of the questions are marked "repeated". As to plaintiff's alleged "illiteracy" his answers showed that he clearly comprehended what was meant by the statement on the deposit agreement that the "survivor shall be the absolute owner of the balance", etc., for when it was read to him and he was asked, "Do you know what that means?", he replied: "Why, it means it turns over to her from the bank after my death." It also appears that he had no difficulty in understanding what the at-

torney for his wife's estate, Mr. Gilfillan, said to him about his legal rights and about inheritance taxes.

If the majority opinion is to be the law of this State then any *other* seventy-seven year old individual who is somewhat "illiterate" and "without any formal schooling" can repudiate his written agreement as does this plaintiff, by simply changing his mind about it later and declaring in court, "I didn't realize at the time."

The appellate courts of this State have hitherto stoutly maintained that written contracts cannot be altered or annulled by such parol uncorroborated testimony as we have here. In *Collins v. Horn*, 124 Pa. Superior Ct. 115, that court in an opinion by Judge PARKER said of a defense that the signer of a note "thought he was signing an application to become a member of" a health club: "The defense cannot prevail in the face of the specific terms of the writing", and Judge PARKER added: "This case is ruled by *Gianni v. Russell & Co.*", supra. In *Russell v. Sickles et al.*, 306 Pa. 586, at 591, Mr. Justice DREW, speaking for this court, said that "We have repeatedly announced it as our policy to uphold the integrity of written instruments."

The finding of facts by a court en banc are binding on this court *only* when they are supported by legally sufficient proof. This court has repeatedly said in varying but definite language what we said in *McConville v. Ingham*, supra, at 520: "On appeal . . . the appellate court shall . . . determine if the facts have been rightly found. When the appellate court is satisfied that facts have been found without proof, or material facts established by the proofs have not been found, it follows that there has been plain mistake." In the instant case there was no such proof as the law requires to set aside a written contract. We have shown that the plaintiff's own testimony was of a most dubious and inconclusive character, and the majority opinion admits that it was "uncorroborated". Even if it had been clear and unequivocal, it was not sufficient *without* corroboration to

warrant the court's granting plaintiff's prayer, which was "to make a decree declaring null and void the deposit agreement aforesaid." Since the plaintiff's testimony (such as it was) *was* uncorroborated it was the duty of the court below to decree that he had *failed* to meet *the measure of proof* required by law. It should not be overlooked in this case that the plaintiff is asking for the cancellation of a written contract which he both *signed and sealed,* as appears in this record as "Exhibit A",[1] attached to plaintiff's bill.

Wigmore on Evidence, 3d ed., Vol. 9, sec. 2431, quotes with express approval as the correct and "orthodox" rule (and stated that it now prevails in Pennsylvania) what was said by the Supreme Court of Virginia in *Tower v. Lucas' Exr.,* 13 Gratt. (Va.) 705. It reads as follows and is most apposite to *this* case: "Neither a court of law nor a court of equity can act upon a hypothesis of fraud where there is no legal proof of it."

Because the court below acted upon such a hypothesis where there was "no *legal* proof of it", the decree of that court *should* be *reversed.*

Mr. Justice HORACE STERN concurs in this dissent.

---

[1] The agreement pleaded by this plaintiff and which he asks to have *annulled* on his own "uncorroborated" testimony reads as follows: "We, the undersigned, hereby declare that we are the joint owners in joint tenancy of the money that is now or may hereafter be deposited in the FOURTEENTH STREET BANK in our names, and of any interest that may accrue or be credited thereto, and that both of us must sign and receipt for the whole or any part thereof, before the death of the other, and that the death of either of us the survivor shall be the absolute owner of the balance then due on the account, as surviving joint tenant, and is hereby authorized to receive the same from said bank on his or her individual check or order therefor. It is further stipulated that this agreement is not revocable. except on notice in writing signed by both parties hereto. Witness our hands and seals this 15th day of Sept. 1941.
(s) Charles Lochinger (Seal)  (s) Chas. W. Hutchins  Witness
(s) Christina Hanlon  (Seal)  (s) J. E. Roth  Witness"