Katz, Admrx., *v.* Lockman, Appellant.

Argued January 13, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

reargument refused April 14, 1947.

*Lemuel B. Schofield,* with him *John B. Brumbelow,* for appellant.

*Harry M. Miller,* with him *Ned Stein,* for appellee.

OPINION BY MR. JUSTICE DREW, March 24, 1947:

Samuel Lockman turned over to his son, Harvey, $3,000 in cash for the purpose of defraying certain personal expenses, and he also transferred his United States Savings bonds of the aggregate maturity value of $7,300 from his own name to that of himself and Harvey with right of survivorship. Following his death, his daughter, Minnie Katz, Administratrix of his estate, sought by the bill in equity filed in this case to compel defendant, Harvey Lockman, to account for the $3,000; and also to have set aside the transfer of the bonds and have them delivered to her, on the ground that defendant, by fraud and undue influence, had induced the father to place them in their joint names. After hearing on bill and answer, the learned Chancellor decreed that defendant pay to plaintiff $1,535.90, with interest, and directed that the bonds be transferred and delivered to her. The court en banc dismissed the forty-eight exceptions filed by defendant and entered a final decree affirming the action of the Chancellor. Defendant then appealed.

The father was the owner of the United States bonds and had them registered in his own name. Some of them had been purchased by the father himself, but most had been purchased with his money by his daughter. They were on deposit in his own safety deposit box in the Gimbel Brothers Bank in Philadelphia. He had suffered from a serious illness for about six months prior to his death, at the age of 72, on February 27, 1944, and for considerable periods during that time was hospitalized in Philadelphia and in Boston. Except to sign his name, he could not read or write. His personal relations with his son, the defendant, were strained

and unfriendly for a long time prior to July, 1943, when he began to make his home with the son.

On October 25, 1943, the father and defendant went to Gimbel Brothers Bank, removed the bonds from the former's box, and took them to the Federal Reserve Bank, where, after the execution of an application for reissue of the bonds made payable to "Samuel Lockman or Harvey Lockman", they were left for that purpose. At the same time, the father and defendant, in the presence of each other, signed a joint tenancy agreement so that both would have control and access to the safety deposit box, which up to that time had been in the father's name alone. In doing so, defendant, for some obscure purpose, used the fictitious name of "Harry Bernstein." On the afternoon of that same day, the father was taken by defendant to Mt. Sinai Hospital, Philadelphia, where he remained as a patient until his discharge on October 30, 1943, when he returned to defendant's home. New bonds were issued to "Samuel Lockman or Harvey Lockman", and mailed in two separate envelopes on October 27 and 28, 1943, to the father at the residence of defendant. The bonds were received by defendant while his father was still in the hospital, and he has retained them ever since.

On October 30, 1943, when the father was released from Mt. Sinai Hospital, that institution turned over to defendant, at the direction of the father, the cash sum of $3,000, which the latter had deposited there. This fund was entrusted to defendant, who admittedly was acting as the financial agent for the father, for the sole purpose of defraying certain medical, hospital, traveling, hotel and other expenses of the father. Out of this money, defendant paid $1,464.10, leaving a balance unaccounted for by him of $1,535.90.

Samuel Lockman died, intestate, on February 27, 1944, leaving to survive him four daughters, one of whom is plaintiff-administratrix, and two sons, one of whom is defendant. The bonds and $3,000 represented

practically all of the father's assets. The day following the funeral, while the family was sitting in mourning, defendant admitted to his brother and sisters that the father, prior to his death, had given him certain instructions regarding the disposition and distribution of the bonds and cash. From these instructions, it clearly appears that the bonds and cash were to be distributed, rather than to be retained by defendant as his own property.

It is the contention of defendant that it was error to have permitted his brother and sisters to testify as to matters occurring during the father's lifetime; that plaintiff did not meet the burden of proving the fraud alleged; and that there was insufficient evidence that he received $3,000 in cash from his father, for which he was under a duty to account.

Over objection of counsel for defendant, the Chancellor permitted defendant's brother and sisters to testify to a conversation that occurred between the father and his daughter, plaintiff, on or about November 9, 1943, at the 30th Street Station of the Pennsylvania Railroad, in Philadelphia, when the father was being taken by defendant to a hospital in Boston. This testimony was to the effect that on that occasion, when the father and all his children, including defendant, were present, the father told plaintiff that defendant had informed him that government bonds were invalid unless they had two names on them, and that the father then also criticized plaintiff for not having so informed him when she had purchased some of the bonds for him. It was also stated by these witnesses that defendant broke up that conversation by saying: "Let's skip it; let's not even talk about it; he [the father] doesn't know what he's talking about; he don't know what you're talking about." Plaintiff argues that such testimony was admissible because the cross-examination of defendant had disclosed admissions and declarations by him which struck down the prima facie inter vivos

gift claimed by defendant, and, therefore, the relative positions of plaintiff as Administratrix and defendant with regard to the father's interests were reversed. Defendant, however, contends that the bonds passed to him as an inter vivos gift, with right of survivorship, by the father's own act in having them placed in both names, and for that reason it was error to permit these witnesses to testify.

We are of one mind in believing that this testimony was inadmissible under the Act of May 23, 1887, P. L. 158, section 5, clause (e), which provides: "Nor, where any party to a thing or contract in action is dead . . . shall any surviving or remaining party to such thing or contract, or any other person whose interest shall be adverse to the said right of such deceased . . ., be a competent witness to any matter occurring before the death of said party . . ." In *King v. Lemmer*, 315 Pa. 254, 173 A. 176, where the situation was somewhat similar to the present one, it was said, in holding such testimony to be inadmissible (p. 256) : "By decedent's own act the property passed to his wife, a party on the record. The daughters, in opposing this transfer, are opposite parties on the record. The issue involved is the right or capacity of the decedent to transfer or make a gift of this property. The daughters deny that he had either that right or capacity. The transfer being prima facie valid, both right and capacity are presumed to exist. Appellents to succeed must first strike down this prima facie case. In doing so the interest of appellants of necessity must be adverse to that of decedent." See also *Crothers v. Crothers*, 149 Pa. 201, 24 A. 190.

But, even after the testimony relating to the conversation at the 30th Street Station is excluded, we are convinced the remaining evidence is clearly sufficient to establish that a confidential relationship existed between the father and defendant, and shows very suspicious circumstances surrounding the making of the alleged gift which on defendant's own admission—which admis-

sion he later said was false—was to be qualified. We think the evidence was ample to overcome the presumption of a gift, and cast upon defendant the burden of proving that the transaction was the free and voluntary act of the father.

In this connection, we said, in *Weber v. Kline*, 293 Pa. 85, 87, 141 A. 721: "The chief grounds on which gifts or bequests are most frequently attacked are lack of capacity and undue influence. Generally speaking, the burden of showing both incapacity and undue influence rests on those asserting the facts. But this rule does not apply where . . . some vicious element in connection with the transaction, is such that the law compels the recipient of the bequest or gift to show that it was the free, voluntary and intelligent act of the person giving it. Though there may be capacity to give, the law, nevertheless, casts this burden on the recipient. The factors which bring this rule into action are fraud, confidential relation, weakness of mind not otherwise incapable, and gross deception. When these appear in the course of an investigation as to the validity of gifts, the burden of proof will immediately shift."

In *Lochinger v. Hanlon*, 348 Pa. 29, 33 A. 2d 1, an aged father, with impaired hearing and other physical infirmities, sought to set aside an alleged inter vivos gift to his daughter of a joint interest in his savings account, with the right of survivorship, on the ground that the transaction had been induced by undue influence and false representations of the daughter. There, this Court said (pp. 30, 31): "We are unanimously agreed that if this case were one in which the burden of proof rested upon plaintiff to establish by affirmative evidence the existence of coercion or fraud, or if the record showed that plaintiff had, of his own free will and with full understanding, created this joint account with the incident of survivorship, the evidence would not be sufficiently clear and precise to support the decree. In the opinion of the majority of this court,

however, the evidence is sufficient to show that the transaction was entered into by the father under a mistake of fact and was also sufficient to cast upon the daughter the burden of proving that the gift was the free and voluntary act of the father, which burden she has failed to sustain."

In the instant case, defendant was called by plaintiff for cross-examination. Defendant produced no evidence himself, nor was he recalled as a witness in his own behalf. The testimony which he gave is well described by the learned Chancellor as follows: ". . . there has never appeared before us a witness of such unreliability as this one, who apparently did not comprehend the maze of contradictions he led himself into with an abandon unparalleled in the records of this court, admitting the commission of one falsehood after another . . ." His testimony was filled with numerous contradictions and evasions with regard to the circumstances surrounding the removal of the bonds from the safety deposit box, his use of a fictitious name probably to conceal his access to the box and its contents, and his retention of the reissued bonds. The transfer occurred when the father was being taken by defendant to a hospital for treatment for a very serious illness. He was aged and infirm; he could not read or write. Defendant was acting as his financial agent, and admittedly was taking care of all arrangements for his father. The transfer into the joint names was made but four months prior to the father's death, and there was no consideration given for it. The cash turned over to defendant by the Boston hospital and the bonds represented almost all of the father's assets. In view of these facts and circumstances, as well as defendant's admission that his father had instructed him relative to the distribution of the bonds and cash, there can be no doubt but that the burden shifted to defendant to show that the alleged gift was in all respects fair and honest, and in no way tainted by fraud or undue influence. "Transactions by

which a decedent shortly before his death practically strips himself of all his available property are naturally regarded with suspicion, and are to be scrutinized with a keen and somewhat incredulous eye": *Wise's Estate,* 182 Pa. 168, 171, 37 A. 936. See also *Henes v. McGovern,* 317 Pa. 302, 176 A. 503.

We have carefully read the entire record and are firmly convinced that defendant failed completely to meet the burden cast upon him under the circumstances here presented. It was said by this Court, in *Palmer v. Foley,* 305 Pa. 169, 173, 157 A. 474: "There is a legal presumption of a confidential relation in certain cases, like attorney and client, guardian and ward, etc. In the case of parent and child, however, the legal presumption does not exist, but its existence is a question of fact for the trial court to be determined from the testimony . . . On appeal, the question is whether the conclusion is supported by sufficient evidence; here, that question must be answered in the affirmative. The existence of this relation raises a presumption of undue influence. The fact that plaintiff was aged, of feeble mind, could neither read nor write, had no independent advice . . ., that, from the time plaintiff went to reside with Mrs. Foley [daughter of plaintiff], the latter exercised entire control of the former's affairs even to the witnessing of her cross mark on checks, and that the transactions in question were shockingly improvident, as they left the old lady penniless and helpless, all lend support to the conclusions of the trial court."

The evidence here establishes that Mt. Sinai Hospital turned over to defendant on October 30, 1943, at the direction of the father, the sum of $3,000 as the latter's agent to pay the father's expenses. Defendant contends that he expended the entire sum for that purpose. The burden was on defendant to establish the discharge of his duties with regard to these moneys by competent and credible evidence. This he failed to do as to $1,535.90 of that fund. Therefore, the Chancellor properly di-

204

rected defendant to turn this balance over to plaintiff, as administratrix of the father's estate.

Decree affirmed, at defendant's costs.