## Ruck Estate

TAXIS, P. J., July 11, 1972.—The first account of the Fidelity Bank and Wesley H. Caldwell, Executors, was examined and audited by the court on January 3, January 17 and March 29, 1972.

The account shows a principal balance for distribution of $687,255.93, composed of securities and investments as set forth on pages 1 and 2 thereof, $459,562.-96; real estate known as 2955 Edge Hill Road, Upper Moreland Township, Montgomery County, $36,750; and distributions of $245,000, for a total of $741,362.96, leaving an overdraft of cash of $54,107.03. There is an income balance of $49,921.08, composed of cash.

Decedent died on March 20, 1970. On November 15, 1968, he had been adjudicated incompetent by this court, and the present accountants were appointed guardians of his estate. There is attached to the executors' account an account of the guardianship, pursuant to the procedure suggested in section 631(b) of the Incompetents' Estates Act of February 28, 1956, P. L. (1955) 1154, 50 PS §3101, and approved in Ayers Estate, 7 Fiduc. Rep. 669, 74 Montg. Co. L. R. 246 . . .

On April 24, 1970, decedent's widow, Johanna Ruck, elected to take against his will and codicils and also all conveyances within the provisions of the Estates Act of April 24, 1947, P. L. 100, 20 PS §301. By his will and codicils, decedent left the income from a marital deduction portion of the residue to his wife for life, with a further right to invade principal up to $15,000 per year. She also received a general testamentary power of appointment over the principal of this fund remaining at her death, and there were gifts over in case of the wife's failure to exercise the power. Johanna Ruck received no interest or share in the nonmarital

portion of the residue, all of which passes to charities. Johanna Ruck has since died, and her estate, through Wesley H. Caldwell, Esq., executor, now participates in these proceedings. The Rucks had no children, so that the share of decedent's estate encompassed by the election is one-half: Wills Act of April 24, 1947, P. L. 89, sec. 8, 20 PS §180.8.

Four problems are before us for determination, all resulting mainly from the election against the will filed by Johanna Ruck. They are: 1. Whether the election encompasses three transfers of cash made by decedent to the Preachers Aid Society of the Pennsylvania Conference of the United Methodist Church to provide for certain annuities and, if so, the amount or portion of the fund subject to the election; 2. whether the election extends to a certain "Household Trust" set up by decedent in his lifetime, with Herman Belz and Martha Belz as trustees, and further with regard to this trust, whether there should be an apportionment of Pennsylvania transfer inheritance taxes and Federal estate taxes against it; 3. to what extent the election reaches a specific devise of real estate to Herman Belz and Martha Belz, and whether the estate or the devisees are responsible for the 1971 taxes and a sewer assessment upon said real estate; and 4. whether the election reaches the proceeds of certain U. S. Savings Bonds, Series J, purchased by decedent in his lifetime and redeemed by the guardians of his estate, and whether these proceeds belong to Herman Belz and Martha Belz, the "payable-on-death" (p.o.d.) beneficiaries named in bonds as issued, or to the estate. These matters will be discussed in the above order.

### 1. Transfers to the Preachers Aid Society

On December 30, 1959, decedent transmitted $6,000

to the Preachers Aid Society, together with a letter saying that it was ". . . a tax free contribution to the Society." In the same letter, decedent stated that he was reserving ". . . the right to change the following conditions at any time . . . ," and then directed that, ". . . As soon as feasible after my death, life annuities at the then applicable rates and terms . . ." should be paid to Herman Belz and Martha Belz. On January 23, 1960, another $6,000 was transmitted, ". . . under the same terms and conditions as laid down in my letter of December 30, 1959. I reserve the right to change those terms at any time." On January 16, 1961, a final gift of $8,000 was made to bring the total fund supporting the annuities to $20,000. The accompanying letter read, ". . . I reserve the right to change this at any time. Otherwise, the annuities are to be paid to H. and Mr. Belz at the then applicable rates and terms." Counsel for both sides have stipulated that the funds are presently deposited in the endowment fund of the Preachers Aid Society, and that the combined value of both annuities is $10,766.37.

The estate claims that these transfers were either testamentary gifts, taking effect only at death, or conveyances within section 11 of the Estates Act. Counsel for Mr. and Miss Belz, who are brother and sister, argues that the transfers were outright, and that decedent retained none of the substantial attributes of ownership which would bring the fund within section 11.

Section 11 of the Estates Act, supra, specifies that the election of a surviving spouse will encompass as a testamentary disposition any lifetime conveyance where decedent retained a power of appointment by will, or a power of revocation or consumption over the principal of the transferred property. There undoubtedly is a certain ambiguity in the letters written by

decedent on the occasion of these transfers, when he spoke of reserving a right to change "terms" or "conditions" of the gift. However, in the first letter, he referred only to the "following" conditions, which related to the names and addresses of the annuitants, the amounts to be paid to each and when payments should start. The second letter adopted the language contained in the first, and while the third letter was a little more general in its wording, it, too, was basically a repetition of the first. We think it fairly clear that decedent expressed or indicated no intention to reserve the right to reclaim the transferred funds, or even a part of them, for his own use and benefit. Certainly, such intention should be clearer than it is here before we set aside, even to the extent of one-half, such a long-standing transaction by decedent, especially where he never took any action whatever to change or modify any of its terms.

In Fitzgerald Estate, 42 D. & C. 2d 676 (1967), a spouse's election was held to extend to an annuity, but only because of the retention by the transferor of a power to appoint by will and powers to revoke and consume. Closer to the facts before us are Snyder Estate, 15 Fiduc. Rep. 608 (1965), and Killion Trust, 13 Fiduc. Rep. 397 (1963). In Snyder, the retention of merely a right to select the beneficiary of any unpaid annuity funds, one time, was held insufficient to bring the fund within section 11; in Killion, the retention of a life estate and the right to add property to the fund produced a like conclusion. It is clear that the retained powers, no matter how termed, must be substantial ownership rights in order to allow the surviving spouse to elect against the fund. As we have construed the powers retained by George Ruck in the transferred fund, they give rise to no rights in his widow. We further note that the transfer was only of some two per-

cent of decedent's total estate, and, therefore, could not support the inference of an actual intent to defraud the wife of any significant marital rights. We hold, therefore, that the election does not reach any portion of the transfers to the Preachers Aid Society.

## 2. *Household Trust*

This trust was created by a deed dated December 15, 1966, with Herman Belz and Martha Belz as trustees. It was funded with $70,000 in cash, and authorized the trustees to use the fund to maintain decedent's household and in general to take care of his and his wife's personal needs during his lifetime. Decedent's physical and mental decline which led ultimately to incompetency may have been the motive for this trust. Any balance in the trust left at decedent's death was given to the trustees as their absolute property. Mr. and Miss Belz have prepared and submitted a signed accounting covering the transactions in the trust from its inception to date (attached to the stipulation filed), which sets forth in detail the numerous receipts and expenditures made. The estate appears to agree that the accounting is satisfactory and intends to permit this trust to be settled by receipt and release at the appropriate time. Actually, accountants agree and have stipulated that the sum of $5,293.35 should be repaid to the trust by the estate, because expenditures in that amount which were not actually chargeable to the trust by its terms were made by the trustees during decedent's life for his benefit.

In paragraph K of the deed, settlor specifically reserved ". . . the right to amend, change or revoke the (trust) at any time . . ." No further discussion is, therefore, needed to demonstrate that the spouse's election reaches the funds remaining in the trust at decedent's death. A further problem has arisen regard-

ing this trust, however, because of conflicting death tax clauses in the deed of trust and in testator's will.

In the will, which was dated December 28, 1960, and which was followed by four codicils (the last being dated June 5, 1966) there was, paragraph SIXTH, a broad, lawyer-drawn tax clause of the usual type, providing that all death taxes, ". . . on the value of all assets either passing under this my Will or outside hereof, . . ." should be paid out of the nonmarital portion of the residuary estate. To further emphasize testator's intent, the paragraph stated, in addition, that none of these taxes should ". . . be borne either by the Marital Deduction Share of my residuary estate or by Martha Belz or Herman Belz, or by any property received by it or them . . ." This seems clear enough until we inspect the deed for the household trust, which was executed after the will and all the codicils, and there we find a similarly explicit provision, in paragraph I, stating, "Trustees shall . . . pay from the principal of this Trust any and all taxes due by reason of this Trust, . . . including income, gift, transfer, inheritance, estate and succession taxes, both State and Federal, without apportionment, . . ." Mr. and Miss Belz argue that the clause in the will governs the issue because the trust, being revocable, is not to be regarded as a final manifestation of the settlor's intent, as he may recall or revoke it at any time. In support of this contention, they cite Finneran Estate, 28 D. & C. 2d 502 (1962), a case in this court, where it was held that, because the inter vivos trust there involved was irrevocable, a clause in decedent's will (drawn subsequent to the trust deed) requiring the residue of the estate to pay all taxes, did not supersede a provision in the trust deed charging death taxes attributable to the trust principal. That case was correctly decided, we think, not because of any sanctity in an

irrevocable deed of trust, but simply because the trust was by its terms incapable of subsequent modification by *any* act of the settlor, including his will. The case stands for no other rule. It certainly does not hold or even infer that provisions of a revocable trust are weaker or less binding than provisions in a will, or that language in a deed of trust is generally to be accorded less weight than the language of a will, which, of course, is also revocable. Here, both clauses appear in revocable documents, and the only substantial issue before us is the determination of decedent's overall intent.

The tax clause in the deed of trust was the final expression by decedent of his intentions regarding the payment of the death taxes imposed on the trust. Its clear effect was to revoke, as would a formal codicil, the tax exoneration clause in the will as it would have been applied to the trust. Under section 5 of the Wills Act, supra, any writing which is executed and proved in the manner required of a will may have a revocatory effect, and if it is inconsistent with an earlier provision in the will, it will revoke the earlier provision pro tanto. See Boyer Estate, 372 Pa. 553 (1953), as to the limitations on this rule where it is possible to construe the two provisions as consistent with each other. Here, however, it is not possible to harmonize the provisions with respect to payment of taxes on the trust assets, though our holding clearly leaves the testamentary provision unimpaired as to every other asset in decedent's estate. We rule, therefore, that the death taxes attributable to the household trust assets should be apportioned thereto and paid by trustees. Cf. Bell Estate, 3 Fiduc. Rep. 185 (1953) (O. C., Del. Co.), where the court discussed the principles to be applied when a later writing (in that case also

a deed of trust), by implication but not by specific words, revokes part of an earlier will.

### 3. Real Estate Taxes and Sewer Assessment Obligations

Decedent devised a five-acre tract of unimproved real estate to Herman Belz and Martha Belz in a codicil dated August 24, 1962. The real estate taxes on this tract were paid by the estate for 1970, the year of decedent's death; concerning these there is no dispute. 1971 taxes were also paid, but, by stipulation, counsel for all parties agree that, for present purposes, this was a mistake and that these taxes should be regarded as unpaid. On September 1, 1970, Upper Moreland-Hatboro Joint Sewer Authority assessed the said tract for $2,460.62, on account of the construction of a sanitary sewer benefiting the same. The estate declines to pay this assessment and contends that this amount and the 1971 taxes are both obligations of the devisees. On the other hand, the devisees point out that the tract has never been distributed to them, that under the Fiduciaries Act of April 18, 1949, P. L. 512, sec. 501, 20 PS §320.501, personal representatives have broad rights of control and management over even specifically-devised real estate until distribution actually occurs, and that the spouse's election gives her an interest in the property so that the devisees do not, in any event, have title to the real estate.

The estate cites section 104 of the Ficuciaries Act, supra, as the basis for holding that title to the tract is in the devisees. In addition, they point out that section 501 is not concerned with title, but has as its purpose only the conservation of any real property which might be needed to pay creditors or for other administrative purposes. They also argue, but not convincingly, that the devisees have a right to possess

themselves of the tract, as it is vacant and unimproved, and that section 501 by its own terms does not apply to real estate occupied by a devisee. Undoubtedly, the basic rule is that a devisee of specific real estate is required to bear all charges against the devised property which are incurred after the death of the testator: McManus' Estate, 3 Dist. Rep. 183 (1894). However, this rule developed before the enactment of section 501, aforesaid, and must be applied now in light of the statute. We do not believe that the fact that devised real estate is vacant or unimproved is the equivalent of actual possession or occupancy within the meaning of the words in section 501. Further, the real estate in question is part of decedent's probate estate and is, therefore, encompassed by the widow's election. It is consequently subject to an interest of some type in the electing spouse. See Runyan Estate, 10 Fiduc. Rep. 379 (1960); Morcroft Estate, 16 Fiduc. Rep. 289 (1966). Therefore, if present payment is appropriate, it will be necessary for the funds to come from the estate for the time being.

However, the substance of the rule in McManus' Estate, supra, should still be observed. Payment of the taxes and assessment constitutes a special benefit to the devisees of the tract, and if they are not required to bear these charges, they would receive a legacy of greater value than that which testator left them at his death. Since these charges were levied against the property after decedent's death, they cannot be regarded as debts of the estate in any event. Of course, if the widow's election ultimately results in the diminishing of this specific devise, the devisees are entitled to be made whole out of the residue: Edelman's Estate, 336 Pa. 4. But what the devisees should receive is the land as it was at decedent's death or

its value at that time, not the land plus additional expenditures which add to its value to the devisees.

### 4. Proceeds of United States Savings Bonds

The fourth issue concerns the ownership of the proceeds of certain United States Savings Bonds, Series J, purchased by and issued to decedent prior to his incompetency. The total face amount of the bonds was $220,000. Ten bonds of $10,000 each were issued on July 1, 1953, and were registered "George Ruck p.o.d. Herman Belz." Ten other $10,000 bonds were issued on the same date, and were registered "George Ruck p.o.d. Martha Belz." These 20 bonds matured on July 1, 1965. On January 1, 1956, decedent purchased two more $10,000 bonds and registered them "George Ruck p.o.d. Herman Belz." These latter bonds matured on January 1, 1968. None of the bonds paid interest after maturity.

Decedent did not redeem the bonds at maturity. They were found by his guardians shortly after their appointment on November 15, 1968. Pursuant to the applicable regulations of the United States Treasury relating to payment of such bonds to other than the registered owner (31 C.F.R. 315.35, 315.37, 315.50 and 315.65) the guardians redeemed the bonds and were paid the maturity value thereof, which they have invested in a segregated account pending determination of the ownership of these funds.

Herman Belz and Martha Belz claim the proceeds on the basis of their p.o.d. designation, which was placed on the bonds by decedent. The estate counters that it was the duty of the guardians to redeem the bonds since they were not productive after maturity, and that, when they did, their action had the same effect as if decedent had done so, so that the rights of the p.o.d. beneficiaries terminated. The estate also con-

tends that such rights actually ceased as early as the maturity of the bonds, but this argument lacks merit, since the regulations provide that even after maturity the United States Treasury will pay the proceeds to a p.o.d. beneficiary, upon proof of death of the registered owner.

Of initial concern to us is the effect of the Treasury Regulations on the issues presented. Has a State court the power to order the disposition of these proceeds other than as the bonds were registered, even if State law would so require? Based on the supremacy of Federal law, the Treasury Regulations have long been explicit in reserving to the Treasury the right to determine the owners of its obligations, and the conditions upon which they will be paid. Nevertheless, in particular situations, our courts have held that once the proceeds have been paid according to the regulations, they could be encumbered, controlled or distributed according to State law without encountering any problems with Federal supremacy: Katz v. Lockman, 356 Pa. 196; Myers Estate, 359 Pa. 577; Horstman Estate, 398 Pa. 506. In Neglia Estate, 403 Pa. 464, decided in 1961, the Supreme Court of Pennsylvania affirmed a parol gift of United States bonds by a wife to her husband, although the bonds were registered to the wife and another person and had been issued prior to marriage. The case stood for the proposition that so long as State courts did not interfere with the initial payment of the proceeds according to the regulations, there was no conflict between State and Federal law.

This was changed, however, by Free v. Bland, 369 U. S. 663, decided in 1962 (United States Supreme Court). Not only were the regulations held to rule the initial payment of the proceeds, but it was also decided that State courts could not take any action after such payment which would have the effect of altering the

ultimate recipient of the proceeds from the party or parties designated as owner by the regulations. Dictum indicated that fraud would be the only ground on which this rule could be modified, but fraud was not pleaded or shown in Free v. Bland. Then, in Yiatchos v. Yiatchos, 376 U. S. 306, decided in 1964, the element of fraud, at least in the context of the present controversy, was found where one spouse used community property to purchase United States bonds in the spouse's name alone; it was further held that relief from such fraud could be granted by State courts.

Whether the Yiatchos decision finding fraud in a unilateral conveyance of community property would be extended to its counterpart in noncommunity property States, the surviving spouse's election, still appears to be an open question. However, we do not believe that we need decide this here. In the present case, the Treasury Regulations were fully complied with at the time of redemption and should no longer have any effect upon the disposition of the bond proceeds. The guardians obtained payment under the terms of the regulations, which at that point in time recognized decedent as the sole and unqualified owner of the bonds, and his guardians as entitled to payment. This case is quite different from Free v. Bland, supra, where the lower court sought to impress a trust upon United States bond proceeds as soon as they were paid, and thus, in effect, change the recipient of them to a person not named as an owner or beneficiary at all. Here, the issue is whether the regulations continue to control the disposition of the proceeds by their owner even after they have been properly paid to him, and we conclude that they do not. Whatever effect the p.o.d. designation retains now, as an effective expression of decedent's intent, stems entirely from the inherent meaning of the words involved, and

not from any supremacy of the regulations. The interest of the United States Treasury in preserving and protecting the rights of the p.o.d. beneficiaries ended when the bonds were paid back to their rightful owner's guardians. In this important respect, the case at hand also differs from Graham Estate, 4 Fiduc. Rep. 467 (1963), and Hetrick Estate, 17 Fiduc. Rep. 317 (1965), and thus is not governed by those decisions.

It is not difficult to see that the widow's election reaches the proceeds of these bonds. If they belong in the probate estate, as contended by the executors, they clearly are subject to the election. If they belong to Mr. and Miss Belz, they, nevertheless, are property over which, during his lifetime, decedent retained a full power of revocation, consumption and control. Either way, the widow is entitled to her one-half of the proceeds.

The remaining problem is whether the redemption of the bonds by the guardians had the same legal effect as redemption by decedent would have had, terminating the rights of the p.o.d. beneficiaries. We have concluded that the acts of the guardians, while entirely justified in turning nonproductive into productive assets, nevertheless did not disturb the property rights in the bonds originally created by decedent, and that the proceeds of the bonds now belong to Mr. and Miss Belz.

The powers of guardians of the estate of an incompetent are not as extensive as the powers which the ward himself would have over his estate, were he competent. Guardians are appointed to preserve the assets of one who cannot do so for himself, and to see that the estate is properly utilized for his care and well-being. Guardians have no powers not directly related to their purpose; they are not trustees: Riley Estate, 1 Fiduc. Rep. 586 (1951). Therefore, unless required

for the benefit of the ward himself, guardians have no power to disturb or modify the acts or arrangements of the ward carried out prior to incompetency: Misto Estate, 10 Fiduc. Rep. 215 (1960); Kingham Estate, 14 Fiduc. Rep. 293 (1964). George Ruck was a wealthy man by almost any standard, with ample estate outside of these bonds for all his needs. There was no need and accordingly no power in the guardians to supersede the arrangements which he had made with respect to the bonds while he was competent.

In Riley Estate, supra, the court refused to allow a guardian to redeem United States bonds held by the incompetent and his children jointly. This result was reached in spite of the fact that the proceeds of the bonds would have been used to pay creditors, but the court noted that its duty was to carry out the arrangements which the incompetent had made. In Misto Estate, supra, it was held improper for a guardian of an incompetent to withdraw the balance in a joint bank account where there were otherwise (page 218) ". . . sufficient assets in the estate to provide for the ward's support and maintenance, . . ." Further, "The guardian's unauthorized withdrawal of these funds disturbed the status quo, the carefully planned dispositive scheme of the person who later became incompetent, which it had no right to do any more than it had any right to revoke any will of the incompetent . . ."

In Kingham Estate, supra, this court ruled specifically that an adjudication of incompetency did not sever a joint tenancy with right of survivorship in bank accounts, so that at the death of the incompetent the surviving co-owners were entitled to the balances in the accounts. We said (page 296), "In the present case, the estate of the incompetent, excluding the bank accounts in question, was sufficient to meet the needs

of the incompetent, and the status quo of the bank account in question was never disturbed."

The contention of the estate amounts, in effect, to a claim that the guardians' action in redeeming the bonds worked an ademption of the p.o.d. beneficiaries' rights, since the bonds themselves, which established those rights, no longer existed. Certainly, the effect of the p.o.d. registration of the bonds was testamentary; it never was altered by decedent during competency; it contemplated the same result as a specific bequest of the bonds by will. However, had such a bequest been the form of the gift, section 14(17) of the Wills Act, supra, would have preserved the rights of the beneficiaries in the proceeds of the bonds. That section, enacted in 1965, says: "A specific devise or bequest shall not be adeemed when the testator or the testator's estate receives an asset in exchange for the subject of the devise or bequest and the act which otherwise would have caused the ademption occurs while the testator is an adjudged incompetent. In such case the devise or bequest shall be deemed to apply to whatever was received in exchange." Technically, this statute does not apply; but it represents the policy and rationale to be followed in such cases, especially since the result we reach is in accord with, rather than contrary to, the last expressed intent of decedent. The statute is also in accord with prior case law, on the issue of ademption where a guardian converted specifically devised property prior to the incompetent's death: Irwin Estate, 10 Fiduc. Rep. 241. There is also an exhaustive discussion of the history of this problem and the principles to be applied to its solution in Neal Estate, 14 Fiduc. Rep. 277, a well-considered opinion with which we agree. We, therefore, hold that the proceeds of the United States bonds belong to Herman Belz and Martha Belz, subject to the spouse's election.

It is evident, however, that Mr. and Miss Belz are not entitled to the income earned prior to decedent's death by the investment of the proceeds. Their rights did not arise until decedent died, and the estate is, therefore, entitled to all income earned or accrued by the segregated fund prior to that time. The original proceeds of the bonds plus income earned after decedent's death, less the portions thereof due the spouse under her election, constitute the interest of Mr. and Miss Belz in the fund. The computation of the aforesaid amounts shall be set forth by counsel in the schedule of distribution hereinafter ordered.

The account, as herein modified, is confirmed, and it is hereby ordered and decreed that the Fidelity Bank and Wesley H. Caldwell, executors, as aforesaid, forthwith pay the distributions herein awarded.

Subject to distributions heretofore properly made, the net ascertained balances of principal and income are awarded as set forth under the last paragraph of the petition for adjudication and rider attached thereto.

Counsel for accountants shall file a schedule of distribution in duplicate.

And now, July 11, 1972, this adjudication is confirmed nisi.

*Wright, Spencer, Manning & Sagendorph,* by *Samuel L. Sagendorph,* and *Roper & Caldwell,* by *Wesley H. Caldwell,* for accountants.

*Rawle & Henderson,* by *George M. Brodhead,* for claimants.

*Philip C. Herr, 2d,* for The Preachers Aid Society.

*Anthony J. Giangiulio,* for Board of Assessment Appeals.

## OPINION SUR EXCEPTIONS

TAXIS, P. J., October 2, 1972.—Exceptions have been filed by the estate of Johanna Ruck, deceased, the

surviving spouse of George Ruck, and by Herman and Martha Belz, claimants, to an adjudication of this court dated July 11, 1972.

In the adjudication, we ruled that the proceeds of certain United States bonds, purchased by decedent in 1953 and 1956 and designated "p.o.d. Herman Belz" and "p.o.d. Martha Belz," belonged to Herman and Martha Belz, but were subject to the widow's elective rights. Decedent became incompetent in 1968, after the bonds matured and ceased to pay interest. Thereafter, the bonds were redeemed by the guardians of his estate but the proceeds have been kept separate and traceable.

The exceptions by the Johanna Ruck Estate contend that all rights of the p.o.d. beneficiaries terminated at maturity of the bonds, and that we erred in finding that the claimants had any rights therein at decedent's death. We disagree.

A preliminary question has been raised as to the standing of the wife's estate to except to the adjudication. By our decision and under the spouse's election, her estate will receive one-half of the proceeds. Even if we were wrong in awarding the proceeds to Mr. and Miss Belz and they are assets of the estate, it is difficult to see how she could receive more. It is said, however, that there are tax considerations involved, and, therefore, we will dispose of the exceptions on the merits.

As to those merits, however, we can add little to what was said in the adjudication. In its brief, exceptant has cited Cochrane's Estate, 398 Pa. 506 (1960), as a decision for our further consideration. We find that the actual citation of this case is Horstman Estate, and we have already considered that case in the adjudication, along with others in the line of Pennsylvania cases dealing with the problem of State court jurisdiction over the ultimate ownership of United States bonds. We have not changed our view that it is inapplicable here. In the

first place, Neglia Estate, 403 Pa. 464 (1961), appears to modify the strict rule in Horstman Estate, supra, that Treasury Regulations entirely exclude State courts from this area, and Neglia Estate is also more in harmony with Yiatchos v. Yiatchos, 376 U.S. 306, a decision of the United States Supreme Court. In addition, the contract between George Ruck and the Federal government did not exist at his death, having been terminated in accordance with its own provisions, and according to the government's regulations. As to the contention that the rights of the "p.o.d." beneficiaries ceased at maturity, the record plainly shows that this is not so, and that the Treasury would have paid the proceeds to them upon proof of the death of the owner, even after maturity.

The Johanna Ruck Estate also contends that we erred in the adjudication in referring to and effectuating the "p.o.d." registration of the bonds as testamentary, since decedent's will was made in 1960 after the bonds were purchased and contained a clause revoking all prior wills and testamentary writings. This somewhat misconstrues our language, we think, because we simply said that the effect of the "p.o.d." registration was testamentary; we clearly did not find that it was a will, and it is evident that, like the beneficiary designation in an insurance policy, such registration cannot be changed or revoked by a will. We see no indication, moreover, that testator, in revoking his prior wills and testamentary writings, intended to or even thought that he could, bring these bond registrations within that language. The point is that decedent clearly expressed, and never changed, an intent that these bonds go to Mr. and Miss Belz at his death, and that such intent must be carried out unless some plainly applicable rule of law requires the contrary. Except only the spouse's election, discussed next, we find no such bar.

The exceptions of claimants Herman and Martha

Belz take the opposite position on the same issue, namely, that they are entitled to all of the proceeds free of the widow's election. Reliance is placed by them upon the treasury regulations and decisions holding such regulations solely controlling in determining who is entitled to ownership of United States bonds in any given circumstances, including the death or incompetence of an owner. It is urged by claimants that had the guardians not redeemed the bonds, they would have remained the registered "p.o.d." claimants, and would have accordingly received the bonds free of the interests of anyone else, including the electing spouse. We have mainly disposed of this point by ruling that the regulations do not restrict our powers in the case at hand, the contract between decedent and the government having been terminated before his death by redemption of the bonds. As suggested in the adjudication, we are inclined to believe that under current Federal law on this point, Yiatchos v. Yiatchos, supra, we would not be powerless to subject the proceeds of the bonds to the widow's election if the law of Pennsylvania so specified, even if the contract of ownership was still in force at death; in Levites v. Levites, 27 Ill. App. 2d 274, 169 N.E. 2d 574 (1960), cited by claimants, it was still in force and so that case does not guide us here. Further, the statutory policy of our Commonwealth is to protect the spouse's rights in property over which a decedent has retained during his life a power of revocation, consumption and control: Estates Act of 1947, P. L. 100, sec. 11, 20 PS §301.11. We should not expand or create exceptions to this policy where we are not required to do so, even though under other circumstances the policy must give way to the superior interests of the Federal government. In any event, the contract between decedent and the government included a provision that the proceeds of the bonds might be paid to

guardians under prescribed procedures if the owner became incompetent, and since such rights as claimants have derive entirely from that contract and its various terms and provisions, they cannot complain that all of its provisions do not ultimately favor them.

In summary, therefore, we hold: (1) the rights of the p.o.d. beneficiaries did not terminate at the maturity of the bonds; (2) the redemption of the bonds by the guardians, being unnecessary for the care, maintenance or wellbeing of George Ruck, did not disturb the property rights in them created by him prior to his incompetence, the power to do this being personal only; (3) the p.o.d. designations were not altered or revoked by testator's 1960 will; (4) the widow's election under Pennsylvania law reached the bond proceeds; and (5) the United States Treasury Regulations do not in this case prevent this court from subjecting the bond proceeds to the widow's election, as they did not apply to the proceeds after they were properly paid over to the guardians.

Accordingly, October 2, 1972, all of the exceptions to the adjudication are dismissed.